POWER, ROGERS & SMITH, An Illinois
Professional Corporation

    Plaintiff,

EAGAN AVENATTI, LLP, a California Limited
Liability Partnership f/k/a EAGAN O'MALLEY
& AVENATTI, LLP; and MICHAEL J.
AVENATTI, individually

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

2014 JUN 30  PH 2: 51

CLERK
U.S. DISTRICT COURT

No.

**1:14-cv-05004**
**Judge  Harry D. Leinenweber**
**Magistrate Judge Daniel G. Martin**

## DEFENDANT MICHAEL J. AVENATTI'S NOTICE OF

## REMOVAL OF ACTION

**From Cook County**

**Case No. 14L 004136**

**FILED**

**JUN 3 0 2014**

THOMAS G  BRUTON
CLERK, U S  DISTRICT COURT

**To:**    United States District Court
       Northern District of Illinois

    Defendant Michael J. Avenatti, in pro per, does hereby exercise his right under the

provisions of 28 U.S.C. § 1332, 28 U.S.C. § 1441(a) and (b), and 28 U.S.C §1446(b), to remove

this action from the Circuit Court of Cook County, Illinois, in which this cause is now pending as

Case No. 14L 004136.  In support thereof, Defendant states as follows:

    1.    On April 29, 2014, a civil action was commenced in the Circuit Court of Cook

County, Illinois styled Power, Rogers & Smith v. Eagan Avenatti, LLP, and Michael J. Avenatti,

Case No. 14L 004136 ("State Court Action"), by the filing of a Complaint.  A copy of Plaintiff's

Complaint is attached hereto as Exhibit "A."  Defendant subsequently signed a Notice and

Acknowledgment of Receipt of Summons and Complaint.

2.     This notice is being filed within thirty (30) days after receipt by Defendant of the State Court's Order dated June 3, 2014 setting the time within which Defendant is to respond to the Complaint.

3.     The action bought by Plaintiff is wholly of a civil nature over which the United States District Court for the Northern District of Illinois has original jurisdiction pursuant to 28 U.S.C. §1332 and one that be removed by Defendant pursuant to 28 U.S.C. §1441(a) and (b) and 28 U.S.C. §1446(b), as the State Court Action is based upon allegations of breach by Defendants of a contract for the division of attorney's fees.

4.     Plaintiff is seeking damages in excess of $75,000.00 and, therefore, the jurisdictional amount set forth in 28 U.S.C. §1332(a) has been satisfied.

5.     The District Courts of the United States have been given original jurisdiction pursuant to 28 U.S.C §1332(a) in that complete diversity of citizenship existed at the time of the filing of this action and still exists as between the Plaintiff and Defendants, and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

6.     Upon information and belief, Plaintiff is an Illinois professional corporation with its principal place of business in Cook County, Illinois.

7.     Defendants are (i) a limited liability partnership whose members are all citizens of a state other than Illinois with its principal place of business in Newport Beach, California and (ii) an attorney who is not resident of the State of Illinois.

8.     Service of this Notice of Removal is being made on all parties as required by law.

9.     Promptly after filing this Notice of Removal, Defendant will serve upon the Plaintiff and file with the Clerk of Circuit Court of Cook County, as required by law, a "Notice of Filing of Notice of Removal" (without exhibits) in the form attached as Exhibit "B."

WHEREFORE, Defendant prays that this action be removed to this Court for further proceedings, as though this action had originally been instituted in this Court.  Defendants

reserve the right to seek a stay of this action in favor of arbitration and an order from this Court compelling Plaintiff to submit to arbitration.

Dated this 30th day of June, 2014.

EAGAN AVENATTI, LLP

By: _Michael J. Avenatti_
Michael J. Avenatti
Defendant in Pro Per

Michael J. Avenatti (*In Pro Per*)
EAGAN AVENATTI, LLP
450 Newport Center Drive, Second Floor
Newport Beach, CA 92660
Phone: (949) 706-7000
Fax: (949) 706-7050

Exhibit A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT - LAW DIVISION

POWER, ROGERS & SMITH, a      )
Illinois Professional Corporation,      )
     )
      Plaintiff,      )
     )
     )
v.      )    **No.**
     )
EAGAN AVENATTI, LLP, a California      )
Limited Liability Partnership f/k/a EAGAN      )
O'MALLEY & AVENATTI, LLP;      )
MICHAEL J. AVENATTI, Individually,      )    <u>**JURY DEMANDED**</u>
     )
      Defendants.      )

O.C. RECEIVED HARBOR JUSTICE CENTER SHERIFF'S DEPT. 2014 APR 29 P 2:34

## COMPLAINT AT LAW

Plaintiff POWER ROGERS & SMITH, a Illinois Professional Corporation, hereby complaining against Defendants EAGAN AVENATTI, LLP, a California Limited Liability Partnership f/k/a EAGAN O'MALLEY & AVENATTI, LLP; and MICHAEL AVENATTI, Individually, pleading hypothetically and in the alternative, states as follows:

### <u>General Allegations</u>

1. At all times herein mentioned, Plaintiff POWER ROGERS & SMITH (hereinafter referred to as "PRS") is an Illinois professional corporation, with its principal place of business located in Cook County, State of Illinois.

2. At all times herein mentioned, Plaintiff PRS has been engaged in the practice of law.

3. Plaintiff PRS is informed, believes and thereon alleges that at all times herein mentioned that Defendant EAGAN AVENATTI, LLP f/k/a EAGAN O'MALLEY & AVENATTI, LLP (hereinafter referred to as "EA") is a California limited liability partnership, with its principal place of business located in the County of Orange, State of California.

4. At all times herein mentioned, Defendant EA has been engaged in the practice of

EXHIBIT A

law.

5.     Plaintiff PRS is informed, believes and thereon alleges that all times herein mentioned that Defendant MICHAEL J. AVENATTI is and was an attorney licensed by the State of California.

6.     At all times herein mentioned, Defendant MICHAEL J. AVENATTI is and was a partner in the firm of EA.

7.     At all times herein mentioned, Defendant MICHAEL J. AVENATTI was an actual employee and/or agent of Defendant EA.

8.     At all times herein mentioned, Defendant MICHAEL J. AVENATTI was acting within the course and scope of his actual employment and/or agency with Defendant EA.

9.     At all times herein mentioned, the conduct of Defendant MICHAEL J. AVENATTI was ratified by Defendant EA.

10.    In or around July of 2010, Defendants MICHAEL J. AVENATTI and EA retained Plaintiff PRS to assist and act as local counsel in a civil lawsuit entitled *Koss Corporation v. Grant Thornton, LLP and Sujata Sachdeva,* filed in Cook County, Illinois, No. 10 L 7342 (hereinafter referred to as "the civil lawsuit").

11.    The aforementioned civil lawsuit arose from an embezzlement by Koss Corporation senior officer Sujata Sachdeva between June 30, 2004 and June 30, 2008 and the negligence of Grant Thornton, LLP, in failing to detect this misconduct and informing its client Koss Corporation of the irregularities.

12.    That Plaintiff PRS and Defendants EA and MICHAEL J. AVENATTI entered into a valid contract outlining the Contingent Fee Legal Services / Fee Sharing Agreement (hereinafter referred to as "the contract") regarding representation of Koss Corporation in its civil lawsuit against

2

Sujata Sachdeva and Grant Thornton, LLP. (*See Attached Exhibit A*, Contract Between Plaintiff and Defendants)

13.    The contract provided for a contingency fee for legal services in the civil lawsuit to be between 28.0% to 33.3% of the gross settlement, verdict or judgment, depending on when the Lawsuit is resolved. (*See Exhibit A*)

14.    The contract provided for the following fee sharing agreement between the Plaintiff and Defendants:

> In the event the case is settled after one hundred twenty [120] days following the filing of the Lawsuit but before the first day of jury selection or the first day of arbitration, as applicable, EOA, as lead counsel, shall receive 80% of the Attorneys' Fees and PRS shall receive 20% of the Attorneys' Fees.

(*See Exhibit A*)

15.    The contract further provided that [I]n the event PRS is required to perform significant legal work, arguments or become lead co-counsel, PRS shall receive 5% in addition to the 20% outlined above. (*See Exhibit A*)

16.    The contract was signed by Michael Koss on behalf of Koss Corporation, Michael J. Avenatti on behalf of Defendant EA and Joseph A. Power, Jr. on behalf of Plaintiff PRS. (*See Exhibit A*)

17.    The civil lawsuit entitled *Koss Corporation v. Sujata Sachdeva and Grant Thornton, LLC,* was filed in the Law Division of Cook County Circuit Court, Illinois on June 24, 2010 and given a Case Number of 10 L 7342. (*See Exhibit B*, Complaint at Law)

18.    On August 11, 2010, the Honorable Lee Preston entered an *Order* allowing Defendant Michael J. Avenatti to appear, *pro hac vice,* before the Cook County Circuit Court in the case of *Koss Corporation v. Grant Thornton, LLP, et al.,* as co-counsel for Koss Corporation. (*See*

*Attached Exhibit C*, Order Allowing *Pro Hac Vice* Appearance)

19. On October 25, 2010, counsel for Grant Thornton, LLC filed a motion to dismiss based upon the doctrine of forum non conveniens. The issue was fully briefed.

20. On January 10, 2012, the Honorable Bill Taylor, after hearing oral argument from MICHAEL AVENATTI, granted Grant Thornton, LLC's motion and transferred the case to Wisconsin.

21. Koss Corporation filed its petition for leave to appeal to the First District Appellate Court on February 9, 2012.

22. The First District granted Koss Corporation's petition for leave to appeal on March 9, 2012.

23. Joseph A. Power, Jr., partner with Plaintiff PRS, argued the appeal in the First District.

24. On July 6, 2012, the First District Appellate Court reversed the lower court and remanded the case back to the Circuit Court of Cook County. (*See Exhibit D*, Order of the Appellate Court)

25. As a result of Joseph A. Power, Jr.'s argument in the First District Appellate Court, Defendants EA and MICHAEL J. AVENATTI added an additional 5% to the overall 20% fee that Plaintiff PRS was entitled to receive for its work on this case, as provided for within the contract for legal services. (*See Exhibit E*, E-Mail Confirming the Additional 5% Fee to PRS)

26. On July 1, 2013, the Honorable Frank Castiglione entered an *Order* dismissing the *Koss Corporation v. Grant Thornton, et al.,* case with prejudice, pursuant to settlement. (*See Exhibit F*)

27. That on July 1, 2013, the *Koss Corporation v. Grant Thornton, et al.,* case settled for

Eight Million Five Hundred Thousand Dollars [$8,500,000.00].

## Count I
### (Breach of Contract)

28.     Plaintiff PRS realleges and incorporates by reference each and every allegation contained within Paragraphs 1 through 27 of the general allegations, as fully set forth herein.

29.     Pursuant to the signed Contingent Fee Legal Services / Fee Sharing Agreement [Exhibit A], counsel contingency Koss Corporation was entitled to a minimum 28% Contingency Fee for its legal services in procuring and securing the settlement of $8,500,000.00.

30.     That the Contingent Fee Legal Services / Fee Sharing Agreement herein attached as Exhibit A, constituted a valid, legally binding contract between Koss Corporation, Plaintiff PRS and Defendants EA and MICHAEL J. AVENATTI.

31.     That the Contingency Fee due to counsel for Koss Corporation was $2,380,000.00, which represented 28% of $8,500,000.00.

32.     Pursuant to the Contingent Fee Legal Services / Fee Sharing Agreement [Exhibit A] and the confirming e-mail from Defendant MICHAEL J. AVENATTI [Exhibit E], Plaintiff PRS was entitled to 25% of the Contingency Fee or $595,000.00.

33.     That on October 14, 2013, Defendants EA and MICHAEL J. AVENATTI sent Plaintiff PRS a check in the amount of $338,750.00, which Defendants maintained was Plaintiff's share of the contingency fee for legal services in the *Koss Corporation v. Grant Thornton, LLC., et al.,* case. (*See Exhibit F*)

34.     That at all times prior to October 14, 2013, Defendants never obtained consent from Plaintiff PRS to reduce the contingency fee for legal services prior to issuing the check for $338,750.00.

35.     That at all times prior to October 14, 2013, Defendants failed to inform Plaintiff PRS that it was allegedly reducing the contingency fee for legal services prior to issuing the check for $338,750.00.

36.     That Defendants' failure to issue Plaintiff PRS a check representing Plaintiff's contractually agreed upon term of 25% of the 28% contingency fee form legal services represented a material violation of the contractual terms.

37.     That Defendants' material violation of the agreed upon contractual terms served to shortchange Plaintiff PRS $256,250.00.

38.     That Defendants are currently being sued in the Superior Court of California, County of Orange regarding allegations that they converted and stole attorney fees due to associating attorneys.

WHEREFORE, Plaintiff POWER ROGERS & SMITH, P.C., hereby demand judgment in the amount of Two Hundred Fifty-Six Thousand Two Hundred Fifty Dollars [$256,250.00] plus costs and attorney fees, which represents fair compensation for the material breach of contract alleged herein.

**Count II**
**(Conversion of Property)**

39.     Plaintiff PRS realleges and incorporates by reference each and every allegation contained within Paragraphs 1 through 38, as fully set forth herein.

40.     That the $256,250.00 which Defendants shortchanged Plaintiff PRS on its fee for legal services, represented tangible property belonging to Plaintiff PRS.

41.     That Defendants EA and MICHAEL J. AVENATTI, in failing to pay Plaintiff PRS its contractually agreed upon amount for attorney fees for legal services, converted $256,250.00

6

of Plaintiff's property for its personal use.

WHEREFORE, Plaintiff POWER ROGERS & SMITH, P.C., hereby demand judgment in the amount of Two Hundred Fifty-Six Thousand Two Hundred Fifty Dollars [$256,250.00] plus costs and attorney fees, which represents fair compensation for the conversion of Plaintiff's property alleged herein.

POWER ROGERS & SMITH, P.C.

By: _____
Attorney for Plaintiff

Joseph A. Power, Jr.
Thomas G. Siracusa
Sean M. Houlihan
POWER ROGERS & SMITH, P.C.
70 W. Madison Street
Suite 5500
Chicago, IL 60602
(312) 236-9381

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT - LAW DIVISION

POWER ROGERS & SMITH,
An Illinois Professional Corporation )
)
        Plaintiff, )
)
v. )    No.
)
EAGAN AVENATTI, LLP, a )
California Limited Liability Partnership )
f/k/a EAGAN O'MALLEY & )
AVENATTI, LLP; and MICHAEL J. )
AVENATTI, Individually, )
)
        Defendant. )    **JURY DEMANDED**

### AFFIDAVIT

NOW comes Affiant, Sean M. Houlihan, and being first duly sworn on oath, deposes and states:

1. That he is one of the attorneys representing plaintiff in the above cause of action.

2. That he is familiar with the facts in the above cause.

3. That he has reviewed the available information relating to the money damages in the above matter.

4. That based upon information and belief, the total money damages sought in the above cause are worth in excess of Fifty Thousand Dollars ($50,000.00).

_____
Sean M. Houlihan

Subscribed and sworn to before me
this _____ day of _____, 2014

_____
Notary Public

> KATHLEEN M PLATT
> NOTARY PUBLIC
> OFFICIAL SEAL
> STATE OF ILLINOIS
> MY COMMISSION EXPIRES
> JULY 27, 2014

Sean M. Houlihan
POWER ROGERS & SMITH #31444
70 W. Madison Street, Suite 5500
Chicago, IL 60602
312-236-9381
Attorneys for Plaintiff



# CONTINGENT FEE LEGAL SERVICES/SHARING AGREEMENT

This lawsuit arises out an embezzlement by Defendants, SUJATA SACHDEVA ("Sachdeva") and, inter alia, the negligence of GRANT THORNTON, LLP ("GT"), from June 30, 2004 through June 30, 2008 in not detecting this misconduct and informing its client, KOSS CORPORATION ("Koss"), of these irregularities. Koss' lead counsel, Eagan O'Malley & Avenatti, LLP ("EOA"), has prepared a complaint to be filed in Cook County, Illinois naming Sachdeva and GT as defendants and alleging claims for malpractice, negligence, fraud and breach of fiduciary duty (the "Lawsuit"). EOA wishes to retain the Chicago law firm Power Rogers & Smith, P.C. ("PRS") to assist with the Lawsuit on the terms set forth herein.

The fee for legal services in the Lawsuit is 28.0% to 33.3% of the gross settlement, verdict or judgment, depending on when the Lawsuit is resolved and not including the fee for any legal services relating to any appeal (the "Attorneys' Fees"). All litigation costs and expenses will be paid by Koss.

In the event the case is settled within one hundred twenty (120) days of the date of filing of the Lawsuit, EOA, as lead counsel, shall receive 85% of the Attorneys' Fees and PRS shall receive 15% of the Attorneys' Fees.

In the event the case is settled after one hundred twenty (120) days following the filing of the Lawsuit but before the first day of jury selection or the first day of arbitration, as applicable, EOA, as lead counsel, shall receive 80% of the Attorneys' Fees and PRS shall receive 20% of the Attorneys' Fees. It is understood EOA and Michael J. Avenatti, Esq. shall act and be lead counsel, and shall be responsible for all substantive legal motions, arguments, and act as lead trial counsel. PRS, Joseph A. Power, Jr. and/or Todd A. Smith will act as local counsel, handle all routine court matters including filing the lawsuit, service of summons, routine court appearances, case management conferences and other routine matters. EOA shall brief and argue all substantive matters and act as lead counsel. PRS shall be available to consult with all substantive matters. In the event PRS is required to perform significant legal work, arguments or become lead co-counsel, PRS shall receive 5% in addition to the 20% outlined above.

In the event the case is settled after the first day of jury selection or the first day of arbitration, as applicable, EOA, as lead counsel, shall receive 60% of the Attorneys' Fees and PRS shall receive 40% of the Attorneys' Fees.

Koss Corporation

By:

EXHIBIT A

Power Rogers & Smith, P.C.

By: _____

Joseph A. Power, Jr.


Eagan O'Malley & Avenatti, LLP

By: _____

Michael J. Avenatti, Esq.



IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – LAW DIVISION

| | | |
|---|---|---|
| KOSS CORPORATION, a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. |
| v. | ) ) ) | |
| SUJATA SACHDEVA, a natural person, and GRANT THORNTON, LLP, an Illinois Limited Liability Partnership, | ) ) ) ) | |
| Defendants. | ) | DEMAND FOR JURY TRIAL |

CLERK OF CIRCUIT COURT
LAW DIVISION
10 JUN 24 AM 10:2

2010 L 007342
CALENDAR/ROOM N
TIME 00:00
Prof Malpractice

## COMPLAINT

Plaintiff KOSS CORPORATION (referred to herein as "Koss" or "Plaintiff" or "the Company"), by and through its attorneys, complains against Defendants Sujata Sachdeva ("Sachdeva") and Grant Thornton LLP ("Grant Thornton"), an Illinois limited liability partnership, pleading hypothetically and in the alternative, states as follows:

## NATURE OF THE ACTION

1.    This action arises out of the embezzlement and fraud of Defendant Sachdeva; the failure of defendant Grant Thornton, one of the largest accounting firms in the United States, to properly provide auditing, review and other services to its client, Koss, during its fiscal years ending June 30, 2004 through June 30, 2008; and out of Grant Thornton's issuance of false and misleading audit opinions and other statements in connection therewith.  During this time period, Grant Thornton was paid hundreds of thousands of dollars in audit and review fees by Koss and yet repeatedly failed to properly conduct its audits and quarterly reviews and disclose a systematic pattern whereby the assets of Koss were being wasted, looted, depleted and/or diverted by means



of, among other things, the embezzlement of millions of dollars in Company funds by defendant Sachdeva. Defendant Sachdeva's acts and omissions were designed exclusively to defraud Koss, her employer, loot the Company and allow her to line her own pockets for her own personal financial gain. As set forth herein, Grant Thornton, in the exercise of its audit and review responsibilities, recklessly disregarded, negligently failed to apprehend, and/or failed to disclose numerous accounting irregularities at Koss. Indeed, repeatedly during fiscal years ending June 30, 2004 through June 30, 2008, Grant Thornton represented that the firm would perform an audit of internal control over financial reporting and render a report expressing an opinion on both management's assessment of the effectiveness of internal control over financial reporting and directly on the effectiveness of internal control over financial reporting. Moreover, in planning, designing and carrying out its yearly audits of Koss during fiscal years ending June 30, 2004 through June 30, 2008, Grant Thornton was required to review the Company's internal controls for effectiveness. Grant Thornton subsequently expressed to Koss' management and Audit Committee repeatedly that Koss' system of internal control was effective and Koss relied upon such representations. These repeated representations and failures by Grant Thornton allowed the damage and financial losses to grow and continue. Had Grant Thornton properly performed its audit and review responsibilities beginning with the July 1, 2003 to June 30, 2004 fiscal year and continuing through fiscal year 2008, defendant Sachdeva's embezzlement would have been discovered and Koss would have avoided all or substantially all of its financial losses, which total in excess of thirty million dollars. Instead, it was not until December 2009 that Koss began to discover the embezzlement by Sachdeva and Grant Thornton's associated negligence, carelessness, and reckless conduct as alleged herein.

## THE PARTIES

2. Plaintiff Koss is, and at all relevant times was, a Delaware Corporation with its principal place of business in Milwaukee, Wisconsin. Koss presently designs, manufactures and markets a wide variety of high-fidelity headphone products to customers all over the world. Koss is a publicly traded company listed on the NASDAQ. Koss operates on a fiscal year beginning on July 1 and ending on June 30, of the following year. Thus, for example, fiscal year 2004 began on July 1, 2003 and ended on June 30, 2004.

3. Defendant Sachdeva is a natural person who was continuously employed by Koss during the 1990's until the date of her termination on December 18, 2009. Unaware of Sachdeva's systematic fraud due to the failures of Grant Thornton, Koss and its Officers and Board of Directors reposed trust and confidence in Sachdeva, promoted her, and increased her duties and responsibilities. At the time of her termination, Sachdeva was the Vice President of Finance at Koss and she was responsible for the day-to-day operation of the Company's accounting department and accounting operations. As an officer of the Company, Sachdeva owed Koss numerous fiduciary duties, including a duty of disclosure, a duty of loyalty and a duty to act in the best interests of the Company and its shareholders. Sachdeva was arrested by the Federal Bureau of Investigation in December 2009 and presently faces numerous criminal charges associated with her fraud/embezzlement. She is expected to serve considerable time in prison following her sentencing later this year.

4. Defendant Grant Thornton is an Illinois limited liability partnership that does business in Cook County, State of Illinois. Grant Thornton has a number of partners residing and working within Cook County and, further, that it maintains its principal

place of business within Cook County at 175 W. Jackson Blvd., 20th Floor, Chicago, Illinois 60604. A significant portion of Grant Thornton's audit manuals, training materials, documents, audit work papers, electronic communications and other information directly bearing on Grant Thornton's acts and omissions as alleged herein are located in Cook County at Grant Thornton's offices and those documents, as well as numerous Grant Thornton witnesses, are best accessed in Cook County. Plaintiff is informed and believes and thereon alleges that Grant Thornton is one of the largest accounting firms in the United States and generates over a billion dollars in annual revenues. Grant Thornton was hired to serve, agreed to serve, and did serve as the independent auditor for Koss during fiscal year 2004 through fiscal year 2008.

## FACTUAL BACKGROUND

### Grant Thornton Fails to Properly Investigate, Audit and Report to the Koss Board of Directors and Audit Committee on Sachdeva's Improper Use of Cashier's Checks Drawn on Company Accounts

5.     Koss, from at least the early 1990s, maintained funds on deposit and used the services of The Park Bank, (hereinafter "Park Bank"). Grant Thornton was aware that Koss maintained bank accounts at Park Bank for business operations. During fiscal year 2004 through fiscal year 2008, and while Grant Thornton was Koss' auditors, Sachdeva caused Park Bank to issue cashier's checks drawn on Company accounts for her personal spending and private purposes. Sachdeva engaged in a pattern of conduct whereby she would direct Park Bank to issue cashier's checks made out in a manner that identified payees with initials only. By way of example and not limitation, cashier's checks authorized by Sachdeva and drawn on Company accounts identified the payee as follows: "N.M. Inc.," which on information and belief was the high-end retailer known

as Nieman Marcus; "S.F.A. Inc.," which on information and belief was the high-end retailer known as Sachs Fifth Avenue; "M.F., Corp.," which on information and belief was the retailer known as Marshall Fields; and "V. Inc.," which on information and belief was the high-end fashion designer and/or retailer known as Valentina. Koss is informed and believes and thereon alleges that the true identity of the payees was ascertainable to Grant Thornton by inspecting the reverse side of the Park Bank cashier's checks, which bore the full name of the payee endorsing the cashier's check.

6. Sachdeva, during fiscal year 2004 through fiscal year 2008 and while Grant Thornton was serving as Koss' auditors, caused Park Bank to issue millions of dollars in cashier's checks drawn on Company accounts and made payable to American Express and others in order to pay for personal spending and for private purposes.

7. By way of example only, Koss is informed and believes and thereon alleges that certain Park Bank cashier's checks drawn on Company accounts, which Sachdeva caused to be issued to pay her personal expenses during fiscal years 2004 through 2008, are as follows:

| DATE | CHECK NO. | PAYEE | AMOUNT |
|------|-----------|-------|--------|
| **FY 2004** | | | |
| 7/11/2003 | 4877907565 | M.F. Corp [Marshall Fields] | $20,182.12 |
| 7/11/2003 | 4877907566 | American Express | $22,421.08 |
| 7/11/2003 | 4877907569 | American Express | $25,482.16 |
| 7/11/2003 | 4877907568 | American Express | $6,480.01 |
| 7/11/2003 | 4877907567 | American Express | $25,122.21 |
| 7/17/2003 | 4877907594 | American Express | $25,233.12 |
| 7/17/2003 | 4877907595 | S.F.A. Inc. [Saks Fifth Avenue] | $26,420.08 |
| 7/24/2003 | 4877907650 | Choice | $3,140.60 |
| 7/24/2003 | 4877907651 | Comerica Bank | $8,620.55 |
| 8/6/2003 | 4877907741 | N.M. Inc. [Neiman Marcus] | $33,421.56 |
| 8/8/2003 | 4877907772 | American Express | $27,483.51 |
| 8/30/2003 | 4877907677 | N.M. Inc. [Neiman Marcus] | $37,480.40 |

| Date | Number | Payee | Amount |
|---|---|---|---|
| 9/4/2003 | 4877907911 | S.F.A. Inc. [Saks Fifth Avenue] | $10,220.15 |
| 9/4/2003 | 4877907910 | American Express | $25,120.60 |
| 10/14/2003 | 4877924127 | American Express | $32,540.56 |
| 10/20/2003 | 4877924144 | N.M. Inc. [Neiman Marcus] | $22,120.48 |
| 10/21/2003 | 4877924147 | American Express | $23,482.16 |
| 11/6/2003 | 4877908018 | American Express | $23,111.12 |
| 12/4/2003 | 4877908171 | American Express | $15,830.21 |
| 12/15/2003 | 4877908215 | American Express | $28,412.53 |
| 12/19/2003 | 4877908271 | American Express | $24,821.52 |
| 12/30/2003 | 4877908344 | Choice | $2,942.16 |
| 12/30/2003 | 4877908343 | Chase Manhattan | $6,246.01 |
| 12/30/2003 | 4877908342 | S.F.A. Inc. [Saks Fifth Avenue] | $26,011.13 |
| 1/5/2004 | 4877908367 | S.F.A. Inc. [Saks Fifth Avenue] | $5,280.14 |
| 1/16/2004 | 4877908446 | American Express | $28,460.12 |
| 2/10/2004 | 4877908541 | American Express | $27,430.14 |
| 2/11/2004 | 4877908548 | American Express | $27,512.60 |
| 3/4/2004 | 4877908685 | American Express | $11,122.99 |
| 3/4/2004 | 4877908686 | Comerica Bank | $8,940.22 |
| 3/4/2004 | 4877908687 | N.M. Inc. [Neiman Marcus] | $26,402.18 |
| 3/4/2004 | 4877908688 | American Express | $12,156.55 |
| 3/4/2004 | 4877908689 | Chase Manhattan Bank | $9,820.11 |
| 3/19/2004 | 4877924262 | M.F. Corp [Marshall Fields] | $5,620.18 |
| 3/30/2004 | 4877924323 | S.F.A. Inc. [Saks Fifth Avenue] | $5,623.14 |
| 4/7/2004 | 4877924364 | American Express | $26,421.22 |
| 4/13/2004 | 4877924391 | American Express | $4,149.21 |
| 4/15/2004 | 4877924401 | American Express | $26,422.18 |
| 5/17/2004 | 4877908807 | American Express | $4,299.40 |
| 5/21/2004 | 4877908864 | S.F.A. Inc. [Saks Fifth Avenue] | $6,120.11 |
| 5/21/2004 | 4877908865 | American Express | $32,410.18 |
| 5/28/2004 | 4877906910 | American Express | $8,114.63 |

**FY 2005**

| Date | Number | Payee | Amount |
|---|---|---|---|
| 7/8/2004 | 4877321148 | American Express | $42,814.16 |
| 7/9/2004 | 4877921182 | American Express | $43,812.61 |
| 7/12/2004 | 4877921185 | American Express | $42,150.61 |
| 7/12/2004 | 4877921186 | Comerica Bank | $8,560.40 |
| 7/12/2004 | 4877921187 | Chase Manhattan Bank | $10,130.61 |
| 7/12/2004 | 4877921188 | Chase Manhattan Bank | $11,262.50 |
| 7/12/2004 | 4877921189 | Choice | $2,521.61 |
| 7/12/2004 | 4877921190 | M.F. Corp [Marshall Fields] | $18,436.12 |
| 7/13/2004 | 4877921198 | S.F.A. Inc. [Saks Fifth Avenue] | $22,460.10 |
| 7/13/2004 | 4877921199 | N.M. Inc. [Neiman Marcus] | $23,482.16 |
| 7/13/2004 | 4877921200 | American Express | $21,981.01 |
| 8/2/2004 | 4877924618 | American Express | $8,852.11 |
| 8/3/2004 | 4877921251 | American Express | $5,820.60 |
| 8/6/2004 | 4877921280 | American Express | $42,850.14 |

| Date | Number | Payee | Amount |
|---|---|---|---|
| 8/9/2004 | 4877921284 | American Express | $62,480.11 |
| 8/16/2004 | 4877921313 | N.M. Inc. [Neiman Marcus] | $28,420.16 |
| 9/1/2004 | 4877921422 | Comerica Bank | $9,841.16 |
| 9/1/2004 | 4877921423 | M.F. Corp [Marshall Fields] | $15,281.26 |
| 9/1/2004 | 4877921425 | Chase Manhattan Bank | $8,562.46 |
| 9/1/2004 | 4877921426 | Chase Manhattan Bank | $12,182.61 |
| 9/2/2004 | 4877921441 | American Express | $13,480.12 |
| 9/2/2004 | 4877921442 | American Express | $47,421.14 |
| 9/2/2004 | 4877921448 | American Express | $57,221.38 |
| 9/10/2004 | 4877921486 | American Express | $8,561.11 |
| 9/10/2004 | 4877921487 | American Express | $28,421.15 |
| 9/10/2004 | 4877921508 | N.M. Inc. [Neiman Marcus] | $25,482.11 |
| 9/16/2004 | 4877921511 | V. Inc [Valentina] | $31,211.16 |
| 9/28/2004 | 4877921573 | American Express | $13,852.11 |
| 10/1/2004 | 4977921586 | American Express | $43,521.18 |
| 10/8/2004 | 4877321620 | Chase Manhattan Bank | $12,111.06 |
| 10/8/2004 | 4877921617 | American Express | $43,220.16 |
| 10/8/2004 | 4877921618 | American Express | $13,521.11 |
| 10/8/2004 | 4877921619 | Chase Manhattan Bank | $12,150.60 |
| 10/8/2004 | 4877921621 | Comerica Bank | $11,211.81 |
| 10/20/2004 | 4877921663 | S.F.A. Inc. [Saks Fifth Avenue] | $38,420.16 |
| 10/20/2004 | 4877921664 | N.M. Inc. [Neiman Marcus] | $32,120.11 |
| 10/28/2004 | 4877921720 | American Express | $38,222.15 |
| 11/1/2004 | 4877907206 | American Express | $47,421.14 |
| 11/2/2004 | 4877324653 | American Express | $43,221.14 |
| 11/2/2004 | 4877924654 | American Express | $42,111.11 |
| 12/6/2004 | 4673041327 | American Express | $28,420.15 |
| 12/6/2004 | 4673041328 | American Express | $20,421.14 |
| 12/6/2004 | 4673041329 | N.M. Inc. [Neiman Marcus] | $22,822.66 |
| 12/8/2004 | 4877624918 | American Express | $26,151.11 |
| 12/8/2004 | 4877924916 | N.M. Inc. [Neiman Marcus] | $25,288.18 |
| 12/8/2004 | 4877924917 | American Express | $25,281.61 |
| 12/10/2004 | 4673041368 | S.F.A. Inc. [Saks Fifth Avenue] | $32,160.12 |
| 12/10/2004 | 4673041369 | Comerica Bank | $16,111.11 |
| 12/29/2004 | 4877925051 | American Express | $13,856.01 |
| 1/5/2005 | 4673041679 | American Express | $42,441.61 |
| 1/5/2005 | 4673041680 | Comerica Bank | $18,156.42 |
| 1/12/2005 | 4673041746 | American Express | $45,822.16 |
| 1/24/2005 | 4673041871 | Chase Manhattan Bank | $12,486.44 |
| 1/24/2005 | 4673041872 | Comerica Bank | $17,750.11 |
| 1/24/2005 | 4673041873 | M.F. Corp [Marshall Fields] | $10,911.12 |
| 1/25/2005 | 4673041879 | Chase Manhattan Bank | $13,480.12 |
| 1/25/2005 | 4673041880 | N.M. Inc. [Neiman Marcus] | $27,032.33 |
| 2/9/2005 | 4673042028 | American Express | $42,560.11 |
| 2/10/2005 | 4673042039 | American Express | $45,860.12 |
| 2/11/2005 | 4673042050 | American Express | $45,111.65 |

| Date | Check No. | Payee | Amount |
|---|---|---|---|
| 2/11/2005 | 4673042051 | American Express | $13,820.04 |
| 2/15/2005 | 4673042095 | American Express | $42,850.11 |
| 2/15/2005 | 4673042096 | N.M. Inc. [Neiman Marcus] | $36,414.04 |
| 2/16/2005 | 4673042106 | S.F.A. Inc. [Saks Fifth Avenue] | $14,820.16 |
| 3/7/2005 | 4673042298 | American Express | $45,420.45 |
| 3/15/2005 | 4673042395 | N.M. Inc. [Neiman Marcus] | $26,420.16 |
| 3/15/2005 | 4673042396 | N.M. Inc. [Neiman Marcus] | $7,876.50 |
| 3/17/2005 | 4673042429 | Comerica Bank | $26,240.11 |
| 3/21/2005 | 4673042459 | Chase Manhattan Bank | $13,480.12 |
| 4/6/2005 | 4673042585 | American Express | $34,280.16 |
| 4/6/2005 | 4673042586 | Comerica Bank | $12,490.11 |
| 4/11/2005 | 4673042643 | American Express | $38,290.92 |
| 4/11/2005 | 4673042644 | M.F. Corp [Marshall Fields] | $8,112.62 |
| 4/29/2005 | 4673042802 | Comerica Bank | $18,460.12 |
| 4/29/2005 | 4673042803 | American Express | $28,413.18 |
| 5/5/2005 | 4673042858 | Chris Aiello | $650.00 |
| 5/5/2005 | 4673042859 | Turf's Up | $1,539.18 |
| 5/5/2005 | 4673042860 | Wells Fargo | $742.16 |
| 5/5/2005 | 4673042861 | Cedar Preservations | $2,350.00 |
| 5/9/2005 | 4673042891 | American Express | $48,640.18 |
| 5/9/2005 | 4673042892 | Comerica Bank | $15,632.80 |
| 5/12/2005 | 4673042916 | American Express | $49,244.58 |
| 5/25/2005 | 4673046024 | American Express | $49,580.51 |
| 5/25/2005 | 4673046025 | Comerica Bank | $8,763.63 |
| 5/27/2005 | 4673046048 | M.F. Corp [Marshall Fields] | $8,546.42 |
| 5/27/2005 | 4673046049 | Chase Manhattan Bank | $2,850.11 |
| 5/31/2005 | 4673046071 | American Express | $10,521.62 |

**FY 2006**

| Date | Check No. | Payee | Amount |
|---|---|---|---|
| 7/8/2005 | 4673046412 | N.M. Inc. [Neiman Marcus] | $15,000.16 |
| 7/11/2005 | 4673046423 | American Express | $42,550.13 |
| 7/11/2005 | 4673046424 | Comerica Bank | $20,222.33 |
| 7/12/2005 | 4673046439 | American Express | $52,660.11 |
| 7/12/2005 | 4673046440 | S.F.A. Inc. [Saks Fifth Avenue] | $9,450.82 |
| 7/13/2005 | 4673046468 | American Express | $52,418.11 |
| 7/21/2005 | 4673046948 | Chase Manhattan Bank | $8,480.26 |
| 8/4/2005 | 4436971106 | Comerica Bank | $22,160.15 |
| 9/1/2005 | 4436971367 | American Express | $45,820.16 |
| 9/1/2005 | 4436971368 | Comerica Bank | $22,480.11 |
| 9/6/2005 | 4436971402 | American Express | $48,220.12 |
| 9/15/2005 | 4436971503 | N.M. Inc. [Neiman Marcus] | $20,100.52 |
| 9/28/2005 | 4436971608 | S.F.A. Inc. [Saks Fifth Avenue] | $19,534.33 |
| 10/11/2005 | 4436971736 | American Express | $48,220.11 |
| 10/11/2005 | 4436971737 | American Express | $45,182.64 |
| 10/11/2005 | 4436971738 | American Express | $9,826.41 |
| 10/11/2005 | 4436971739 | Comerica Bank | $23,440.63 |

| Date | Number | Payee | Amount |
|---|---|---|---|
| 10/12/2005 | 4436971752 | American Express | $36,412.81 |
| 11/1/2005 | 4436971910 | Comerica Bank | $25,030.81 |
| 11/1/2005 | 4436971911 | S.F.A. Inc [Saks Fifth Avenue] | $25,830.66 |
| 11/7/2005 | 4436971974 | American Express | $78,260.15 |
| 11/7/2005 | 4436971975 | American Express | $82,440.98 |
| 11/8/2005 | 4436971994 | N.M. Inc. [Neiman Marcus] | $25,482.98 |
| 11/16/2005 | 4436972080 | V. Inc [Valentina] | $38,621.66 |
| 11/28/2005 | 4436972227 | Comerica Bank | $31,860.14 |
| 11/28/2005 | 4436972229 | Chase Manhattan Bank | $5,539.28 |
| 11/29/2005 | 4436972251 | V. Inc [Valentina] | $39,841.11 |
| 12/1/2005 | 4436972291 | American Express | $85,281.78 |
| 12/2/2005 | 4436972303 | American Express | $90,552.65 |
| 12/23/2005 | 4436972563 | V. Inc [Valentina] | $42,182.61 |
| 1/10/2006 | 4436972820 | American Express | $88,431.08 |
| 1/10/2006 | 4436972821 | Surinder Seth | $21,000.00 |
| 1/17/2006 | 4436972877 | American Express | $68,420.15 |
| 1/17/2006 | 4436972878 | N.M. Inc. [Neiman Marcus] | $25,281.46 |
| 1/17/2006 | 4436972879 | N.M. Inc. [Neiman Marcus] | $6,600.00 |
| 1/17/2006 | 4436972880 | S.Bhardwaj | $5,249.00 |
| 1/23/2006 | 4436972915 | Comerica Bank | $25,820.16 |
| 1/23/2006 | 4436972916 | S.F.A Inc [Saks Fifth Avenue] | $10,111.18 |
| 2/3/2006 | 4436976018 | American Express | $102,836.40 |
| 2/3/2006 | 4436976019 | American Express | $101,451.10 |
| 2/13/2006 | 4436976096 | V. Inc [Valentina] | $82,160.83 |
| 2/13/2006 | 4436976097 | V. Inc [Valentina] | $49,999.81 |
| 2/14/2006 | 4436976112 | V. Inc [Valentina] | $73,412.61 |
| 3/13/2006 | 4436976328 | American Express | $52,480.61 |
| 3/13/2006 | 4436976329 | N.M. Inc. [Neiman Marcus] | $24,830.11 |
| 4/6/2006 | 4436976548 | American Express | $62,430.55 |
| 4/6/2006 | 4436976549 | N.M. Inc. [Neiman Marcus] | $35,420.61 |
| 5/8/2006 | 4436976966 | American Express | $65,830.01 |
| 5/8/2006 | 4436976967 | American Express | $44,169.99 |
| 5/25/2006 | 4436977170 | American Express | $32,430.11 |
| 5/25/2006 | 4436977171 | Comerica Bank | $13,480.22 |
| 5/31/2006 | 4436977204 | N.M. Inc. [Neiman Marcus] | $11,820.61 |

**FY 2007**

| Date | Number | Payee | Amount |
|---|---|---|---|
| 7/7/2006 | 4436977569 | American Express | $112,820.61 |
| 7/7/2006 | 4436977570 | American Express | $92,430.56 |
| 7/11/2006 | 4436977599 | Comerica Bank | $25,482.66 |
| 8/1/2006 | 4436977791 | V. Inc [Valentina] | $75,086.44 |
| 8/1/2006 | 4436977792 | V. Inc [Valentina] | $78,935.56 |
| 8/2/2006 | 4436977806 | N.M. Inc. [Neiman Marcus] | $18,100.40 |
| 8/2/2006 | 4436977807 | S.F.A Inc [Saks Fifth Avenue] | $10,120.56 |
| 8/3/2006 | 4436977816 | American Express | $99,432.75 |
| 8/3/2006 | 4436977817 | American Express | $98,480.16 |

| Date | Number | Payee | Amount |
|------|--------|-------|--------|
| 8/3/2006 | 4436977818 | American Express | $98,582.63 |
| 9/1/2006 | 4436978027 | Comerica Bank | $25,840.62 |
| 9/11/2006 | 4436978089 | American Express | $69,397.12 |
| 9/20/2006 | 4436978160 | Comerica Bank | $18,182.61 |
| 9/25/2006 | 4436978205 | Chase Manhattan Bank | $6,523.81 |
| 10/6/2006 | 4436978310 | Comerica Bank | $15,280.16 |
| 10/6/2006 | 4436978311 | S.F.A Inc [Saks Fifth Avenue] | $14,290.82 |
| 10/9/2006 | 4436978325 | Comerica Bank | $18,280.66 |
| 10/9/2006 | 4436978326 | S.F.A Inc [Saks Fifth Avenue] | $18,222.61 |
| 10/16/2006 | 4436978374 | N.M. Inc. [Neiman Marcus] | $30,822.61 |
| 10/16/2006 | 4436978380 | American Express | $9,842.31 |
| 10/24/2006 | 4436978457 | Vatsala Sharma | $14,000.00 |
| 11/1/2006 | 4436978528 | American Express | $108,462.71 |
| 11/1/2006 | 4436978529 | American Express | $91,482.56 |
| 11/2/2006 | 4436978522 | American Express | $100,511.81 |
| 11/10/2006 | 4436978639 | Comerica Bank | $30,280.15 |
| 12/4/2006 | 4436978773 | American Express | $199,284.76 |
| 12/4/2006 | 4436978774 | American Express | $92,715.16 |
| 12/4/2006 | 4436978775 | N.M. Inc. [Neiman Marcus] | $22,820.11 |
| 12/4/2006 | 4436978778 | S.F.A Inc [Saks Fifth Avenue] | $23,121.62 |
| 12/18/2006 | 4436978933 | Chase Manhattan Bank | $6,841.63 |
| 12/18/2006 | 4436978956 | B. Incorporated | $25,463.21 |
| 12/18/2006 | 4436978932 | Comerica Bank | $18,536.65 |
| 1/8/2007 | 4436987147 | American Express | $99,482.62 |
| 1/8/2007 | 4436987148 | American Express | $98,115.35 |
| 1/17/2007 | 4436987247 | Bank of America | $27,851.30 |
| 1/17/2007 | 4436987248 | S.F.A Inc [Saks Fifth Avenue] | $22,430.66 |
| 1/17/2007 | 4436987249 | N.M. Inc. [Neiman Marcus] | $21,830.42 |
| 2/8/2007 | 4436987442 | American Express | $98,470.56 |
| 2/8/2007 | 4436987443 | American Express | $109,529.44 |
| 3/6/2007 | 4436987640 | American Express | $99,483.76 |
| 3/6/2007 | 4436987641 | American Express | $104,013.18 |
| 3/6/2007 | 4436987642 | Comerica Bank | $18,444.11 |
| 4/2/2007 | 4436987832 | American Express | $99,430.78 |
| 4/2/2007 | 4436987834 | American Express | $3,242.11 |
| 4/12/2007 | 4436987918 | S.F.A Inc [Saks Fifth Avenue] | $15,826.53 |
| 4/12/2007 | 4436987919 | N.M. Inc. [Neiman Marcus] | $18,220.51 |
| 4/12/2007 | 4436987920 | Comerica Bank | $13,820.66 |
| 4/20/2007 | 4436987979 | American Express | $9,014.76 |
| 4/30/2007 | 4436988041 | Comerica Bank | $19,820.46 |
| 5/7/2007 | 4436988088 | American Express | $112,536.45 |
| 5/7/2007 | 4436988089 | American Express | $113,463.55 |
| 5/17/2007 | 4436988199 | American Express | $3,536.42 |
| 5/17/2007 | 4436988200 | N.M. Inc. [Neiman Marcus] | $9,855.63 |
| 5/17/2007 | 4436988201 | S.F.A Inc [Saks Fifth Avenue] | $9,541.61 |
| 5/17/2007 | 4463988202 | Bank of America | $11,223.66 |

| | | | |
|---|---|---|---|
| 5/30/2007 | 4436988390 | American Express | $141,520.63 |
| 5/30/2007 | 4436988391 | American Express | $139,479.67 |

**FY 2008**

| | | | |
|---|---|---|---|
| 8/1/2007 | 4436988990 | N.M. Inc. [Neiman Marcus] | $22,830.61 |
| 8/1/2007 | 4436988991 | S.F.A Inc [Saks Fifth Avenue] | $24,616.21 |
| 8/1/2007 | 4436988992 | American Express | $99,620.53 |
| 8/1/2007 | 4436988993 | American Express | $21,450.22 |
| 8/1/2007 | 4436988994 | American Express | $99,430.46 |
| 8/1/2007 | 4436988995 | Bank of America | $16,240.89 |
| 8/1/2007 | 4436988996 | American Express | $115,486.32 |
| 8/17/2007 | 4436989157 | American Express | $98,427.65 |
| 9/6/2007 | 4436989298 | American Express | $98,132.62 |
| 9/6/2007 | 4436989299 | American Express | $102,580.71 |
| 9/6/2007 | 4436989300 | N.M. Inc. [Neiman Marcus] | $28,220.55 |
| 9/6/2007 | 4436989301 | S.F.A Inc [Saks Fifth Avenue] | $26,380.42 |
| 9/13/2007 | 4436989346 | Bank of America | $16,860.55 |
| 9/13/2007 | 4436989347 | N.M. Inc. [Neiman Marcus] | $22,860.51 |
| 9/24/2007 | 4436989410 | American Express | $111,460.89 |
| 9/24/2007 | 4436989411 | American Express | $98,546.81 |
| 10/4/2007 | 4436989508 | American Express | $156,480.36 |
| 10/4/2007 | 4436989509 | American Express | $63,970.33 |
| 10/4/2007 | 4436989510 | Bank of America | $10,480.55 |
| 10/23/2007 | 4436989624 | American Express | $110,480.62 |
| 10/23/2007 | 4436989626 | American Express | $103,555.11 |
| 10/23/2007 | 4436989627 | N.M. Inc. [Neiman Marcus] | $25,860.56 |
| 10/23/2007 | 4436989628 | Chase Manhattan | $6,659.99 |
| 10/23/2007 | 4436989631 | American Express | $3,562.00 |
| 10/23/2007 | 4463989630 | S.F.A Inc [Saks Fifth Avenue] | $22,630.66 |
| 11/5/2007 | 4436989766 | American Express | $150,240.62 |
| 11/5/2007 | 4436989767 | American Express | $152,137.61 |
| 11/5/2007 | 4436989768 | Bank of America | $17,100.22 |
| 11/5/2007 | 4436989769 | V. Inc [Valentina] | $31,130.11 |
| 11/19/2007 | 4436989841 | American Express | $125,480.34 |
| 11/19/2007 | 4436989842 | American Express | $3,355.61 |
| 11/19/2007 | 4436989843 | Chase Manhattan | $9,235.10 |
| 11/20/2007 | 4436989853 | V. Inc [Valentina] | $42,860.31 |
| 11/30/2007 | 4436989915 | Bank of America | $18,460.55 |
| 12/3/2007 | 4436989941 | American Express | $152,460.71 |
| 12/3/2007 | 4436989942 | American Express | $151,111.66 |
| 12/17/2007 | 4450143063 | American Express | $120,622.85 |
| 12/17/2007 | 4450143065 | American Express | $101,258.32 |
| 12/17/2007 | 4450143070 | Chase Manhattan | $9,658.21 |
| 12/31/2007 | 4450143186 | American Express | $125,465.52 |
| 12/31/2007 | 4453143187 | American Express | $119,480.71 |
| 1/9/2008 | 4450143341 | American Express | $112,589.66 |

| | | | |
|---|---|---|---|
| 1/9/2008 | 4450143342 | American Express | $15,246.10 |
| 1/9/2008 | 4450143343 | Bank of America | $16,289.52 |
| 1/9/2008 | 4450143344 | S.F.A. Inc [Saks Fifth Avenue] | $25,611.72 |
| 1/22/2008 | 4450143453 | Sonam Palkyi | $1,030.00 |
| 1/22/2008 | 4450143454 | Laura Thomas | $2,250.00 |
| 1/22/2008 | 4450143455 | Sonu Anand | $2,326.00 |
| 1/23/2008 | 4450143467 | American Express | $120,958.65 |
| 1/23/2008 | 4450143468 | Chase Manhattan Bank | $8,318.27 |
| 1/31/2008 | 4450143528 | American Express | $99,480.62 |
| 1/31/2008 | 4450143529 | American Express | $67,421.14 |
| 2/1/2008 | 4450143540 | American Express | $72,816.11 |
| 2/7/2008 | 4450143597 | N.M. Inc. [Neiman Marcus] | $26,830.42 |
| 2/19/2008 | 4450143742 | Bank of America | $16,280.55 |
| 2/19/2008 | 4450143743 | Chase Manhattan Bank | $6,432.32 |
| 3/17/2008 | 4450144069 | Chase Manhattan Bank | $10,889.74 |
| 3/17/2008 | 4450144070 | S.F.A Inc [Saks Fifth Avenue] | $22,616.24 |
| 3/17/2008 | 4450144071 | N.M. Inc. [Neiman Marcus] | $20,458.14 |
| 3/17/2008 | 4450144072 | Bank of America | $6,880.44 |
| 4/21/2008 | 4450144403 | Bank of America | $10,460.54 |
| 4/21/2008 | 4450144404 | Chase Manhattan | $7,339.59 |
| 4/21/2008 | 4450144405 | S.F.A Inc [Saks Fifth Avenue] | $21,220.55 |
| 4/21/2008 | 4450144406 | N.M. Inc. [Neiman Marcus] | $32,460.54 |
| 5/29/2008 | 4450144681 | Bank of America | $7,341.61 |
| 5/29/2008 | 4450144678 | N.M. Inc. [Neiman Marcus] | $15,280.42 |
| 5/29/2008 | 4450144679 | S.F.A Inc [Saks Fifth Avenue] | $15,480.11 |
| 5/29/2008 | 4450144682 | Chase Manhattan | $6,281.99 |

8. Grant Thornton, in the course of its audits and quarterly reviews of Koss for fiscal years 2004 through 2008, failed to properly investigate, review, audit and report to the Koss Board of Directors and Audit Committee on Sachdeva's improper use of cashier's checks drawn on Koss accounts at Park Bank. Had Grant Thornton properly conducted its audits and quarterly reviews beginning in fiscal year 2004, Koss would not have sustained all or nearly all of the financial losses and damages related to Sachdeva's improper use of cashier's checks up through and including the date of her termination on December 18, 2009.

## Grant Thornton Fails to Properly Investigate, Audit and Report to the Koss Board of Directors and Audit Committee on Sachdeva's Improper Wire Transfers from Company Accounts

9.     Koss, during fiscal year 2008, maintained bank accounts at LaSalle National Bank in Chicago (Cook County) for business operations. Grant Thornton was aware that Koss maintained bank accounts at this financial institution and was aware that Koss would routinely wire transfer funds from an account at LaSalle National Bank in Chicago to pay vendors and other creditors of the Company. Grant Thornton was further aware that Koss and LaSalle National Bank maintained hard copies of documents reflecting wire transfers from these accounts, including the date of the wire transfer, the originating bank and account number, the amount of funds transferred, and the identity of the payee. Beginning on or about February 19, 2008 and through the end of fiscal year 2008, Sachdeva caused wire transfers to be made from Koss' LaSalle National Bank account in Chicago to pay down balances she incurred for personal expenditures on her personal American Express charge accounts. By way of example only, the wire transfers Sachdeva caused to be issued from Company accounts to pay for her personal expenses incurred on her personal American Express charge cards during fiscal year 2008 are as follows:

### WIRE TRANSFERS

| DATE | REF. NO. | PAYEE | AMOUNT |
|------|----------|-------|--------|
| 2/19/2008 | 0210 | American Express | $111,230.42 |
| 2/29/2008 | 0229 | American Express | $122,788.52 |
| 3/6/2008 | 0302 | American Express | $140,241.63 |
| 3/18/2008 | 0314 | American Express | $120,236.42 |
| 4/3/2008 | 0404 | American Express | $132,486.59 |
| 4/15/2008 | 0416 | American Express | $34,852.61 |
| 4/21/2008 | 0424 | American Express | $110,460.54 |
| 5/1/2008 | 0501 | American Express | $83,718.64 |
| 5/7/2008 | 0504 | American Express | $120,842.67 |
| 5/30/2008 | 0539 | American Express | $55,620.81 |

| 6/16/2008 | 0618 | American Express | $112,184.62 |
| 6/19/2008 | 0621 | American Express | $122,864.76 |
| 6/23/2008 | 0625 | American Express | $15,920.61 |
| 6/24/2008 | 0625 | American Express | $52,840.61 |

10.     Grant Thornton, in the course of its fiscal year 2008 audit of Koss and quarterly reviews, failed to properly investigate, audit, review and report to Koss' Board of Directors and Audit Committee on Sachdeva's improper wire transfers from Koss accounts on deposit at LaSalle National Bank to pay balances for personal charges incurred on her personal American Express charge cards. As a result of these failures, Sachdeva continued to make improper wire transfers from Koss accounts until her termination in December 2009. Had Grant Thornton properly conducted its audits and quarterly reviews relating to fiscal years 2004 through 2008, detected Sachdeva's embezzlement and wrongful conduct, and properly reported said conduct, Koss would not have sustained all or nearly all of the in financial losses and damages related to the improper wire transfers.

### Grant Thornton Fails to Properly Investigate, Audit and Report to the Koss Board of Directors and Audit Committee on Sachdeva's Improper Use of Company Traveler's Checks

11.     Koss, during fiscal year 2004 through fiscal year 2008, obtained and distributed American Express Traveler's Checks ("traveler's checks") to Koss employees for use in connection with company business, including business travel, conventions, meetings, and trade shows. Koss is informed and believes and thereon alleges that Grant Thornton was aware of Koss' use of traveler's checks in the course of conducting its business and that Koss employees were required by Koss policies to properly account for their use of traveler's checks provided by the Company. During the fiscal years 2004 through 2008, Sachdeva (i) improperly used the traveler's checks to pay for personal

expenses in the annual amount of approximately $80,000 and (ii) failed to properly account for said traveler's checks.

12. Koss is informed and believes and thereon alleges that Grant Thornton, in the course of its audits and reviews of Koss, failed to properly investigate, review, audit and report to the Board of Directors and Audit Committee on Sachdeva's improper use of Company traveler's checks. Had Grant Thornton properly conducted its audits and reviews beginning in fiscal year 2004, Koss would not have sustained all or nearly all of the approximately $400,000 in financial losses and damages related to Sachdeva's improper use of the Company's traveler's checks.

**Grant Thornton Fails to Properly Investigate, Audit and Report to the Koss Board of Directors and Audit Committee on Sachdeva's Improper Use of Manual Checks**

13. During fiscal year 2004 through fiscal year 2008, Sachdeva (i) used manual checks drawn on Koss accounts at Park Bank and (ii) used manual checks to withdraw cash from Koss accounts at Park Bank to pay for her personal expenses. Sachdeva used manual checks and improperly withdrew cash from Koss accounts in the approximate amount of $209,169.33. By way of example only, the manual checks used to withdraw cash from Koss accounts at Park Bank and to pay for personal expenses of Sachdeva are as follows:

| DATE | CHECK NO. | PAYEE | AMOUNT |
|------|-----------|-------|--------|
| FY 2004 | | | |
| 7/7/2003 | 2960 | Petty Cash | $4,000.00 |
| 7/11/2003 | 2962 | Amex Sachdeva | $256.50 |
| 7/18/2003 | 2964 | Petty Cash | $1,000.00 |
| 8/15/2003 | 2971 | Heiser Ford | $210.81 |
| 8/22/2003 | 2973 | Petty Cash | $4,000.00 |
| 8/29/2003 | 2975 | Tracy Bruneau | $159.97 |

| Date | Check # | Payee | Amount |
|------|---------|-------|--------|
| 9/16/2003 | 2984 | Petty Cash | $4,500.00 |
| 9/26/2003 | 2987 | American Express | $2,444.42 |
| 11/15/2003 | 3000 | Petty Cash | $2,000.00 |
| 12/1/2003 | 3005 | American Express | $1,095.85 |
| 12/23/2003 | 3011 | Petty Cash | $4,000.00 |
| 1/16/2004 | 3014 | Tracy Bruneau | $100.00 |
| 1/16/2004 | 3017 | Humera Kahn | $390.00 |
| 1/21/2004 | 3018 | Petty Cash | $2,000.00 |
| 1/27/2004 | 3020 | Tracy Bruneau | $54.50 |
| 1/30/2004 | 3022 | Humera Kahn | $414.00 |
| 4/12/2004 | 3036 | American Express | $4,449.58 |
| 4/19/2004 | 3039 | American Express | $3,158.72 |
| 7/7/2003 | 2960 | Petty Cash | $4,000.00 |

**FY 2005**

| Date | Check # | Payee | Amount |
|------|---------|-------|--------|
| 7/8/2004 | 3059 | Sarah Filzen | $220.00 |
| 7/9/2004 | 3060 | Petty Cash | $4,000.00 |
| 7/15/2004 | 3061 | Sarah Filzen | $220.00 |
| 7/20/2004 | 3062 | Katie Lampley Family | $271.00 |
| 7/20/2004 | 3063 | Fritkin Jones Design Group | $785.00 |
| 7/22/2004 | 3064 | Sarah Filzen | $220.00 |
| 7/29/2004 | 3065 | Sarah Filzen | $220.00 |
| 8/5/2004 | 3067 | Sarah Filzen | $220.00 |
| 8/6/2004 | 3068 | Petty Cash | $4,000.00 |
| 8/9/2004 | 3069 | Drs. Fabric, Shafrin & Bloom | $116.73 |
| 8/12/2004 | 3071 | Sarah Filzen | $220.00 |
| 8/12/2004 | 3072 | The Collegiate Licensing Co | $5,000.00 |
| 8/19/2004 | 3074 | Sarah Filzen | $220.00 |
| 9/2/2004 | 3077 | Sarah Filzen | $220.00 |
| 9/9/2004 | 3080 | Sarah Filzen | $220.00 |
| 9/16/2004 | 3081 | Sarah Filzen | $220.00 |
| 9/23/2004 | 3082 | Sarah Filzen | $220.00 |
| 9/28/2004 | 3083 | Graphic Systems | $25,000.80 |
| 9/30/2004 | 3084 | Sarah Filzen | $220.00 |
| 10/5/2004 | 3085 | Petty Cash | $2,845.70 |
| 10/7/2004 | 3086 | Sarah Filzen | $220.00 |
| 10/14/2004 | 3087 | Sarah Filzen | $220.00 |
| 10/20/2004 | 3088 | Petty Cash | $2,677.34 |
| 10/21/2004 | 3089 | Sarah Filzen | $220.00 |
| 10/28/2004 | 3090 | Sarah Filzen | $220.00 |
| 11/3/2004 | 3091 | Petty Cash | $4,000.00 |
| 11/4/2004 | 3092 | Sarah Filzen | $220.00 |
| 11/11/2004 | 3093 | Sarah Filzen | $220.00 |
| 11/18/2004 | 3094 | Sarah Filzen | $220.00 |
| 12/9/2004 | 3097 | Open Communications Group | $3,995.00 |
| 12/15/2004 | 3099 | Petty Cash | $2,176.85 |

| Date | Check # | Payee | Amount |
|------|---------|-------|--------|
| 12/16/2004 | 3100 | Sarah Filzen | $330.00 |
| 12/16/2004 | 3101 | Swan Ball | $3,000.00 |
| 12/22/2004 | 3103 | Petty Cash | $3,110.58 |
| 12/23/2004 | 3102 | Exclusive Company | $482.04 |
| 1/4/2005 | 3105 | US Bank | $16,094.46 |
| 1/5/2005 | 3106 | Petty Cash | $2,074.17 |
| 1/6/2005 | 3107 | Sarah Filzen | $220.00 |
| 1/7/2005 | 3104 | GES | $10,000.00 |
| 1/13/2005 | 3108 | Sarah Filzen | $220.00 |
| 1/18/2005 | 3109 | Trish Saytovich | $995.00 |
| 1/18/2005 | 3110 | Petty Cash | $2,818.40 |
| 1/20/2005 | 3111 | Sarah Filzen | $220.00 |
| 1/27/2005 | 3112 | Chris Aiello | $120.00 |
| 1/27/2005 | 3113 | Sarah Filzen | $220.00 |
| 1/28/2005 | 3114 | Charles A. Gutenhurst & Assoc | $1,880.00 |
| 2/4/2005 | 3115 | Petty Cash | $3,334.26 |
| 2/22/2005 | 3117 | Petty Cash | $3,492.41 |
| 2/28/2005 | 3118 | GES | $249.54 |
| 3/3/2005 | 3119 | Perry International | $177.00 |
| 3/11/2005 | 3121 | Petty Cash | $2,107.64 |
| 3/16/2005 | 3122 | Petty Cash | $2,510.00 |
| 3/29/2005 | 3123 | Petty Cash | $3,122.45 |
| 4/1/2005 | 3124 | Overnight Transport | $554.84 |
| 4/5/2005 | 3125 | ADP | $500.00 |
| 4/13/2005 | 3126 | Julie Mulvaney | $3,066.00 |
| 4/22/2005 | 3128 | Petty Cash | $3,705.15 |
| 5/6/2005 | 3129 | Petty Cash | $3,145.76 |
| 5/10/2005 | 3130 | Petty Cash | $3,403.68 |
| 5/19/2005 | 3133 | Catalina Chavez | $173.06 |
| 5/24/2005 | 3134 | Petty Cash | $3,204.59 |
| 6/2/2005 | 3136 | Sarah Filzen | $140.00 |
| 6/3/2005 | 3137 | Petty Cash | $2,867.27 |
| 6/9/2005 | 3138 | Sarah Filzen | $140.00 |
| 6/10/2005 | 3139 | Petty Cash | $2,785.71 |
| 6/21/2005 | 3141 | Sarah Filzen | $210.00 |

**FY 2006**

| Date | Check # | Payee | Amount |
|------|---------|-------|--------|
| 7/13/2005 | 3145 | Petty Cash | $5,000.00 |
| 8/5/2005 | 3153 | Petty Cash | $1,000.00 |
| 10/6/2005 | 3172 | Petty Cash | $785.00 |
| 10/12/2005 | 3175 | Sujata Sachdeva | $5,615.78 |
| 10/14/2005 | 3177 | Julie Mulvaney | $3,149.00 |
| 12/9/2005 | 3194 | Petty Cash | $4,000.00 |
| 1/16/2006 | 3202 | Tracy Bruneau | $1,495.00 |
| 1/23/2006 | 3204 | Petty Cash | $4,000.00 |

**FY 2007**

| | | | |
|---|---|---|---|
| 11/6/2006 | 3264 | ARC Milwaukee | $1,000.00 |
| 11/17/2006 | 3187 | American Express | $30,000.00 |
| 12/7/2006 | 3275 | BBBS | $5,000.00 |
| 12/7/2006 | 3276 | BBBS | $2,000.00 |
| 12/20/2006 | 3281 | Carey Limo | $672.44 |
| 2/9/2007 | 3296 | Carey Limo | $3,002.06 |
| 4/10/2007 | 3318 | Carey Limo | $3,466.53 |
| 5/17/2007 | 3330 | Petty Cash | $1,500.00 |
| 6/5/2007 | 3334 | Petty Cash | $4,000.00 |
| 6/15/2007 | 3337 | Carey Limo | $1,182.92 |

**FY 2008**

| | | | |
|---|---|---|---|
| 8/8/2007 | 3350 | Carey Limo | $1,243.30 |
| 8/17/2007 | 3354 | Julie Mulvaney | $5,099.08 |
| 9/12/2007 | 3361 | Carey Limo | $4,460.28 |
| 10/11/2007 | 3378 | M.E.C. | $4,654.00 |
| 1/2/2008 | 3401 | Petty Cash | $8,000.00 |
| 1/30/2008 | 3411 | Carey Limo | $505.75 |
| 2/4/2008 | 3415 | Petty Cash | $5,000.00 |
| 2/19/2008 | 3419 | Park Bank | $5,000.00 |
| 3/12/2008 | 3426 | Petty Cash | $5,000.00 |
| 3/18/2008 | 3433 | AMEX | $3,430.59 |
| 4/2/2008 | 3436 | Petty Cash | $9,048.89 |
| 4/23/2008 | 3443 | Petty Cash | $4,000.00 |
| 5/6/2008 | 3447 | Rummage Sale | $500.00 |
| 5/9/2008 | 3449 | Petty Cash | $5,000.00 |
| 5/27/2008 | 3454 | Julie Mulvaney | $2,600.00 |
| 5/27/2008 | 3455 | Carey Limo | $2,173.72 |
| 6/3/2008 | 3459 | Bond Holding Corp | $1,163.08 |
| 6/4/2008 | 3461 | Petty Cash | $5,000.00 |

14.    Grant Thornton, in the course of its audits and reviews of Koss for fiscal years 2004 through 2008, failed to properly investigate, review, audit and report to the Board of Directors and Audit Committee on Sachdeva's improper use of manual checks to make payments and cash withdrawals from Company accounts. Had Grant Thornton properly conducted its audits beginning in fiscal year 2004 and continuing through fiscal year 2008, Koss would not have sustained all or nearly all of the approximately $209,169.33 in financial losses and damages related to the improper use of manual checks to pay personal expenses and withdraw cash from Koss accounts.

15.     During fiscal year 2004 through fiscal year 2008, the Koss Board of Directors and Koss Audit Committee, among others, relied on defendant Grant Thornton to (a) audit the Company's financial statements in accordance with generally accepted auditing standards ("GAAS") and Grant Thornton's own internal guidance, practices, policies and procedures and (b) properly determine whether those financial statements were prepared in accordance with generally accepted accounting principles ("GAAP"). Koss also relied on Grant Thornton to properly conduct its quarterly reviews. Koss further relied on Grant Thornton to provide reasonable assurance that (a) Koss' financial statements were free from material misstatement due to error or fraud and (b) Koss' internal system of accounting controls was effective and would reliably ensure that Koss' assets were not, and would not be, embezzled, diverted, depleted, looted and mismanaged.

16.     The Koss Board of Directors and Audit Committee, among others, relied on defendant Grant Thornton to make it aware of any material issues regarding, among other things, any accounting irregularities or inadequacies at the Company, including in connection with the controls regarding the disbursement of Company funds through cashier's checks, wire transfers, traveler's checks, and manual checks, as well as any illegal, improper, tortious or inappropriate conduct by any officer or employee of Koss.

17.     The acts and omissions of Grant Thornton, as set forth herein, were a substantial factor in causing, and exacerbating, the damage to Koss. Defendant Grant Thornton recklessly disregarded, and/or should have known of, Sachdeva's fraudulent

and tortious conduct, as well other material issues with the accounting operations and controls of the Company. Defendant Grant Thornton, however, in breach of its duties, (a) failed to promptly detect and report these issues to the Koss Board of Directors, Audit Committee and others acting on behalf of Koss, and (b) repeatedly assured the Koss Board of Directors, Audit Committee and others, that the Company's accounting systems and controls and financial statements were in order. Grant Thornton's false affirmative representations were made recklessly and without a reasonable basis. Further, Grant Thornton's failures to disclose material problems at Koss allowed the embezzlement, diversion and waste of Company funds to continue for a substantial period of time, up to and including the date of Sachdeva's termination.

18. Koss is informed and believes, and thereon alleges, that Grant Thornton recklessly or negligently failed to apprehend, among other things, the embezzlement, diversion and waste of Company funds by Sachdeva through (i) the improper use of cashier's checks drawn on Company accounts at Park Bank; (ii) improper wire transfers from Company accounts at LaSalle National Bank; (iii) the improper use of traveler's checks; (iv) the improper use of manual checks drawn on Company accounts at Park Bank and (v) the consequential damage to Koss. Grant Thornton's reckless and/or negligent failure to immediately inform the Koss Board of Directors, Audit Committee and others of Sachdeva's conduct and her tortious pattern of activity deprived the Board of Directors, Audit Committee, and others of the opportunity to act more promptly to protect the business operations and assets of Koss, and thereby prevent increased damage to Koss' business, goodwill, business opportunities and reputation. Grant Thornton's acts and omissions were a substantial factor in causing the embezzlement, diversion and waste of Company funds, dissipation of profits and loss of business opportunities and reputation.

19.     Not until December 18, 2009, at the earliest, did the Koss Board of Directors and Audit Committee begin to become aware of (a) any alleged problems with Koss' internal controls and financial statements; (b) the embezzlement, diversion and waste of Company funds by Sachdeva; (c) the fraud and breaches of fiduciary duties by Sachdeva; and/or (d) any breach of duty, failure, misrepresentation, recklessness or other tortious conduct on the part of Grant Thornton. The acts, omissions, negligence and misrepresentations of Grant Thornton allowed the embezzlement, diversion and waste of corporate funds to take root, to increase and to continue, thereby increasing the amount of damage to Koss. Had Grant Thornton acted properly in accordance with its auditing duties and its duties of disclosure, including those imposed by its own internal standards and best practices, and made prompt, true and correct disclosure to the Koss Board of Directors, Audit Committee and others, Koss' Board of Directors and Officers could have, and would have, acted sooner to protect the business, assets, goodwill and reputation of Koss. Such earlier, informed action, could have and would have prevented the embezzlement, diversion and waste of millions of dollars of Company funds, the dissipation and loss of various business opportunities and profits, as well as other damages.

20.     Indeed, once Koss' Officers, Board of Directors and Audit Committee began to discover Sachdeva's embezzlement, diversion and waste of Company funds, the Company immediately commissioned an investigation and undertook steps to minimize the damage to and losses sustained by the Company. These steps included contacting and cooperating with the Federal Bureau of Investigation and Office of the U.S. Attorney, hiring counsel, and hiring forensic accountants, among others, to fully investigate and quantify the losses sustained by the Company. Thereafter, on December 31, 2010, Koss dismissed Grant Thornton as its independent auditors.

21.    As a result of the conduct as herein alleged, Koss has to date sustained damages and financial losses in excess of thirty million dollars.  These losses and damages include but are not limited to the following: (i) funds embezzled by Sachdeva; (ii) professional fees and costs associated with investigating and quantifying the losses sustained by the Company and restating the Company's financial statements; (iii) professional fees and costs associated with defending lawsuits and investigations brought against the Company and others relating to the embezzlement; (iv) additional fees, costs and penalties related to the Company's restated financials; (v) lost profits and business opportunities; and (vi) damage to the Company's reputation.

## COUNT ONE

## AGAINST GRANT THORNTON FOR PROFESSIONAL NEGLIGENCE

22.    Plaintiff incorporates by reference in full the allegations set forth above in paragraphs 1 through 21.

23.    During fiscal year 2004 through fiscal year 2008, Grant Thornton, as Koss' auditors, owed Koss a duty to use such skill, prudence and diligence as other members of its profession commonly possess and exercise; to act reasonably as accountants and auditors; to perform its services in accordance with Generally Accepted Auditing Standards ("GAAS") applicable in the United States, the standards enunciated by the Public Company Accounting Oversight Board (United States) ("PCAOB"), and Grant Thornton's own internal guidance, practices, policies and procedures in rendering accounting and auditing services to Koss.

24.    Grant Thornton failed to act reasonably as accountants and auditors, failed to exercise ordinary care in the performance of its professional duties and responsibilities,

and failed to discharge its professional duties and responsibilities in accordance with GAAS, the standards enunciated by the PCAOB, and Grant Thornton's own internal guidance, practices, policies and procedures. By way of example, and without limitation:

a) Grant Thornton recklessly disregarded, knew or should have known, that Sachdeva was embezzling funds and diverting Company assets for her own personal benefit and to the detriment of Koss.

b) Grant Thornton failed to perform and undertake appropriate inquiries, audit test work, investigation and analysis in connection with the disbursement of Company funds through cashier's checks, wire transfers, traveler's checks, and manual checks to confirm whether they were properly authorized and issued to pay obligations incurred by the Company or, instead, were improperly authorized and issued to pay for millions of dollars in personal expenses incurred by defendant Sachdeva for her own self benefit.

25. Plaintiff is informed and believes, and thereon alleges, that Grant Thornton's reviews during, and audits for, the fiscal years ending June 30, 2004 through June 30, 2008 did not conform with GAAS, the standards enunciated by the PCAOB ("PCAOB Standards"), and Grant Thornton's own internal guidance, practices, policies and procedures in that, at a minimum and without limitation, Grant Thornton failed to exercise due professional care in the planning and performance of its examinations and the preparation of its reports, did not supply the requisite critical review, skepticism and judgment relating to the work done, and failed to maintain proper independence in mental attitude.

26.     In addition, Grant Thornton in connection with the work performed, advice given, and attestations and opinions rendered in connection with the audits and reviews of the financial statements and in connection with the preparation of reports thereon, lacked the requisite skill, prudence and diligence commonly possessed and exercised by the auditing profession, and made statements in connection therewith that were false and misleading.

27.     In addition to its obligations under GAAS, Grant Thornton was required to, but on information and belief failed to, fulfill its duties, professional responsibilities and obligations to Koss by, among other things:

(a) failing to properly train Grant Thornton's auditors and accountants;

(b) failing to properly follow and interpret General Standard No. 1 of GAAS, which requires that audits are "to be performed by a person or persons having adequate technical training and proficiency as an auditor";

(c) failing to properly follow and interpret professional standard QC Section 20 - System of Quality Control for a CPA Firm's Accounting and Auditing Practice;

(d) failing to create and provide relevant and adequate internal guidance, practices, policies and procedures as required by professional standard QC Section 20.20(a);

(e) failing to create and provide appropriate firm guidance materials and practice aids as required by professional standard QC Section 20.20(b);

(f) failing to ensure compliance with firm policies and procedures as required by professional standard QC Section 20.20(d);

(g) failing to provide Grant Thornton's auditors with appropriate guidance on how to conduct audits in accordance with GAAS;

(h) failing to properly create, follow and distribute Grant Thornton's training materials and reference materials provided to Grant Thornton's auditors and accountants;

(i) failing to properly create, follow and distribute internal memoranda relating to professional practice guidelines, including memoranda relating to auditing, fraud detection, embezzlement, and accounting;

(j) failing to require attendance at training courses sponsored and/or held by Grant Thornton relating to auditing, fraud, embezzlement, and accounting;

(k) failing to provide adequate training courses relating to auditing, fraud, embezzlement, and accounting;

(l) failing to properly create, follow and distribute audit engagement manuals, guidance and policies;

(m) failing to properly, create, follow and distribute Grant Thornton's internal manuals related to audit and accounting engagements;

(n) failing to properly create, follow and distribute Grant Thornton's own training videos, materials and documents related to the detection and prevention of fraud, embezzlement and criminal acts;

(o) failing to properly train Grant Thornton's auditors on the detection of fraud, embezzlement and criminal acts;

(p) failing to properly train Grant Thornton's auditors on SAS 82;

(q) failing to interpret and properly follow AU 161;

(r) failing to establish and adopt a system of quality control relating to its audits as required by AU 161;

(s) failing to establish and adopt quality control policies and procedures to provide Grant Thornton with reasonable assurance that its personnel complied with GAAS when performing audits;

(t) failing to adopt policies and procedures and write them down in a systematic manner such as in an audit service manual or other Grant Thornton manual, as required by GAAS;

(u) failing to publish and maintain adequate manuals relating to auditing and accounting as required by GAAS;

(v) failing to follow Grant Thornton's internal accounting methodologies when performing its audits;

(w) failing to properly follow warnings expressed by Grant Thornton's employees that its auditors were not doing enough to detect and/or prevent fraud and comply with GAAS;

(x) failing to properly follow warnings expressed by Grant Thornton's employees that its auditors were not trained well enough to detect and/or prevent fraud and to comply with GAAS;

(y) failing to properly follow the policies, guidance, instructions and/or directions Grant Thornton provided to its employees, including its audit and accounting professionals, relating to audit and accounting engagements;

(z) failing to properly follow Grant Thornton's document retention policies relating to the retention of its own work papers, training videos, materials and documents, including those related to the detection and prevention of fraud, embezzlement and criminal acts;

(aa) failing to retain Grant Thornton's own training videos, materials and documents, including those related to the detection and prevention of fraud, embezzlement and criminal acts;

(bb) failing to properly advise Grant Thornton's partners, auditors and accountants of its liability for negligent and fraudulent acts relating to its audit and accounting engagements;

(cc) failing to properly train Grant Thornton's partners, auditors and accountants about its liability for negligent and fraudulent acts relating to its audit and accounting engagements;

(dd) failing to interpret and properly follow SAS 1;

(ee) failing to interpret and properly follow AU 150;

(ff) failing to interpret and properly follow AU 230;

(gg) failing to interpret and properly follow AU 311;

(hh) failing to interpret and properly follow SAS 82;

(ii) failing to interpret and properly follow AU 312;

(jj) failing to interpret and properly follow AU 329;

(kk) failing to interpret and properly follow AU 333;

(ll) failing to interpret and properly follow AU560; and

(mm) failing to properly present, conduct and teach Grant Thornton's auditors on how to detect fraud, embezzlement, and criminal acts while performing a public company audit.

28.     Koss is further informed and believes, and thereon alleges, that Grant Thornton's failure to properly train and supervise its auditors, as is required by GAAS, related not only to the audit teams involved with the various audits of Koss referenced herein. Rather, Koss is informed and believes, and thereon alleges, that Grant Thornton, since before it was engaged to and did conduct each Koss audit at issue during fiscal years 2004 through 2008, failed to follow GAAS and the firm's own internal policies, procedures and guidance in these regards on a systematic, firm-wide basis and failed to provide proficient, trained and supervised auditors for a number of audit engagements performed for companies other than Koss. This systemic failure by Grant Thornton on a firm-wide basis was a substantial factor in causing damage to Koss.

29.     As a direct, proximate and foreseeable result of the acts, omissions and breaches of duty by Grant Thornton, as herein alleged, Koss has suffered actual damages in an amount that exceeds thirty million dollars, the exact amount to be proven at trial.

## COUNT TWO

## AGAINST DEFENDANT GRANT THORNTON FOR FRAUD AND DECEIT

30.     Plaintiff incorporates by reference in full the allegations set forth above in paragraphs 1 through 29.

31.     Grant Thornton, as an independent auditing firm auditing the financial statements of Koss, assumed the role of a "watchdog." Accordingly, Grant Thornton had a duty to make full, prompt and complete disclosure of any material issue to the Koss Board of Directors and Audit Committee.

32. In addition to Grant Thornton's duty of disclosure as an auditor, because Grant Thornton spoke and made representations with respect to its reports and audits, and with respect to the accounting systems, accounting controls, business operations and financial statements of Koss, Grant Thornton had a duty to speak truthfully, accurately and completely regarding all aspects of its reports and audits and Koss' accounting systems, accounting controls, business operations and financial statements and make full and fair disclosure of all items in connection therewith. Having spoken with respect to these topics, Grant Thornton assumed the duty to speak truthfully, accurately and completely, and not to suppress, omit or conceal any material fact in connection therewith.

33. Grant Thornton also had a continuing duty to disclose any material information that it knew, or suspected, which formed a reasonable basis to indicate that there was a material problem with (i) Koss' operations or accounting systems and controls; (ii) the accuracy of the Company's financial statements; (iii) Koss' ability to properly authorize, issue, document, monitor and/or account for its funds in connection with the use of cashier's checks, wire transfers, traveler's checks and manual checks; (iv) Koss' ability to protect its assets and goodwill; and/or (v) the honesty, veracity and competence of Sachdeva.

34. Grant Thornton recklessly disregarded, or was negligent in not apprehending, significant issues at Koss, including the manipulation and fraudulent use of cashier's checks, wire transfers, traveler's checks and manual checks by Sachdeva, and the concomitant waste, diversion and damage to Koss in material monetary amounts.

35.    In its oral and/or written reports or statements, Grant Thornton made false, reckless and/or misleadingly incomplete representations and/or failed to state material facts concerning, *inter alia*, without limitation:

a.    whether corporate employees such as Sachdeva were manipulating cashier's checks, wire transfers, traveler's checks, and manual checks for their own personal benefit;

b.    whether the systems of controls of Koss were sufficient to ensure that its funds were not embezzled and diverted by Sachdeva;

c.    the internal controls of Koss;

d.    the financial condition of Koss;

e.    the financial statements of Koss;

f.    the risk of accounting error and irregularity in Koss' statements arising out of, at least in part, the internal control system existing at the Company;

g.    Koss' ability to account properly for material transactions in accordance with GAAP;

h.    whether Koss' financial statements were prepared in accordance with GAAP;

i.    whether Grant Thornton's audits were conducted in accordance with GAAS; and

j.    the performance by Grant Thornton in providing audit services and the manner in which it discharged its contractual obligations to Koss.

36.    Grant Thornton made false representations concerning, and/or failed to state material facts about, past and existing material aspects of the operations, internal

and accounting controls, management, policies, procedures, transactions, financial statements, and the financial position of Koss. The false representations made by Grant Thornton included, without limitation, false statements regarding (1) whether Grant Thornton intended to, and did, plan and conduct its audits of the Koss financial statements in accordance with GAAS; (2) whether Koss' financial statements were presented fairly in conformity with GAAP; (3) whether those financial statements were free from material misstatement; and, (4) whether the system of internal accounting controls at Koss was adequate.

37. Even though Grant Thornton knew of, and/or recklessly disregarded, and/or negligently failed to apprehend, the material issues described elsewhere herein, Grant Thornton did not disclose or discuss any of these issues with the Koss Board of Directors.

## Misrepresentations in Connection with the Fiscal Year 2004 Audit

38. Koss is informed and believes and thereon alleges that Grant Thornton partner Melissa K. Koeppel ("Koeppel") was the partner in charge of the fiscal year 2004 audit performed by Grant Thornton for Koss. Grant Thornton partner Mike Altschaefl ("Altschaefl") was the concurring partner in connection with the audit performed by Grant Thornton for Koss. Koeppel and Altschaefl presented Grant Thornton's "Report to the Audit Committee of the Board of Directors" of Koss on July 21, 2004. At that time, Grant Thornton partners Koeppel and Altschaefl met with the members of the Koss Audit Committee and recklessly and/or falsely made the following false representations which were intended for the Koss Board of Directors, Audit Committee and management when made:

- Grant Thornton was in agreement with the Company's reported financial information for fiscal 2004 and Grant Thornton would issue an unqualified opinion in connection with those statements.
- There were no material errors, material irregularities or possible illegal acts that came to Grant Thornton's attention.
- There were no material weaknesses in internal accounting control at Koss.
- Koss' books and accounts and other records, were satisfactorily maintained and the accounting methods employed are satisfactorily applied within the limits of generally accepted accounting standards.

39.     On July 9, 2004, Grant Thornton issued its report recklessly and/or falsely stating, among other things, as follows:

> "We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States)."

> "In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of KOSS CORPORATION and subsidiaries as of June 30, 2004, and the results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America."

40.     In reliance on the audit report and opinion issued by Grant Thornton, Koss incorporated Grant Thornton's audit report and opinion into Koss' Form 10-K Annual

Report, with Grant Thornton's consent; and filed it with the United States Securities and Exchange Commission for the fiscal year ended June 30, 2004.

## Misrepresentations in Connection with the Fiscal Year 2005 Audit

41. On October 1, 2004, Grant Thornton partner Koeppel recklessly and/or falsely made representations to Lawrence Mattson, Chairman of the Audit Committee of Koss, through the Grant Thornton engagement letter, regarding the fiscal year 2005 audit, including but not limited to, the following:

- Grant Thornton's audit of Koss would be conducted in accordance with PCAOB Standards.

- Grant Thornton's audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant judgment and estimates made by management, as well as evaluating the overall financial statement presentation.

- That reasonable assurance from Grant Thornton that Koss' financial statements are free of material misstatement, whether caused by error or fraud, is a "high level of assurance."

- That Grant Thornton would perform audit procedures on any financial statements schedules that were required to be included in certain Company filings with the U.S. Securities Exchange Commission and the purpose of this auditing procedure would be to determine whether these schedules, when considered in relation to the basic financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

- That Grant Thornton, as the Company's auditors, would perform an audit of internal control over financial reporting and render a report expressing an opinion on both management's assessment of the effectiveness of internal control over financial reporting and directly on the effectiveness of internal control over financial reporting.

- That Grant Thornton would advise Koss of fraud involving senior management and fraud that caused material misstatements of the financial statements, which came to the attention of the auditors.

- That Grant Thornton would advise Koss of illegal acts, which came to the attention of the auditors.

42.     Koss is informed and believes and thereon alleges that Koeppel and Altschaefl presented Grant Thornton's "Report to the Audit Committee of the Board of Directors" of Koss on July 20, 2005. At that time, Grant Thornton partners Koeppel and Altschaefl met with the members of the Koss Audit Committee and made the following reckless and/or false representations, which were intended for the Koss Board of Directors, Audit Committee and management when made:

- Grant Thornton was in agreement with the Company's reported financial information for fiscal 2005 and, upon successful completion of the remainder of the audit work, would issue an unqualified opinion on those statements.

- There were no material errors, material irregularities or possible illegal acts that came to Grant Thornton's attention.

- There were no material weaknesses in internal accounting control at Koss.

- Koss' books and accounts and other records, were satisfactorily maintained and the accounting methods employed are satisfactorily applied within the limits of generally accepted accounting standards.

43. On September 28, 2005, Grant Thornton recklessly and/or falsely represented to Koss in its letter to "Management and the Audit Committee of the Board of Directors," among other things, that:

- Grant Thornton was "not aware of any fraud or potential illegal acts that would cause a material misstatement of the financial statements."

- Grant Thornton "proposed no corrections to the financial statements that could, in our judgment, either individually or in the aggregate, have a significant effect on the Company's financial statements."

44. On July 7, 2005, Grant Thornton issued its report recklessly and/or falsely stating, among other things, as follows:

> "We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)."

> "In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of KOSS CORPORATION and subsidiaries as of June 30, 2005 and 2004, and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America."

45. In reliance on the audit report and opinion issued by Grant Thornton, Koss incorporated Grant Thornton's audit report and opinion into Koss' Form 10-K Annual

Report, with Grant Thornton's consent, and filed it with the United States Securities and Exchange Commission for the fiscal year ended June 30, 2005.

## Misrepresentations in Connection with the Fiscal Year 2006 Audit

46.     On October 1, 2005, Grant Thornton partner Koeppel recklessly and/or falsely made representations to Lawrence Mattson, Chairman of the audit Committee of Koss, through the Grant Thornton engagement letter, regarding the fiscal year 2006 audit, including but not limited to, the following:

- Grant Thornton's audit of Koss would be conducted in accordance with PCAOB Standards.

- Grant Thornton's audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant judgment and estimates made by management, as well as evaluating the overall financial statement presentation.

- That reasonable assurance from Grant Thornton that Koss' financial statements are free of material misstatement, whether caused by error or fraud, is a "high level of assurance."

- That Grant Thornton would perform audit procedures on any financial statements schedules that were required to be included in certain Company filings with the U.S. Securities Exchange Commission and the purpose of this auditing procedure would be to determine whether these schedules, when considered in relation to the basic financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

- That Grant Thornton, as the Company's auditors, would perform an audit of internal control over financial reporting and render a report expressing an

opinion on both management's assessment of the effectiveness of internal control over financial reporting and directly on the effectiveness of internal control over financial reporting.

- That Grant Thornton would advise Koss of fraud involving senior management and fraud that caused material misstatements of the financial statements, which came to the attention of the auditors.
- That Grant Thornton would advise Koss of illegal acts, which came to the attention of the auditors.

47. Koss is informed and believes and thereon alleges that Grant Thornton partners Koeppel and Altschaefl and Engagement Manager Sabrena Yatckoske met with the members of the Koss Audit Committee on May 8, 2006, and at that time recklessly and/or falsely represented to the members of the Audit Committee that Grant Thornton knew of no fraud in Koss and had no reason to believe that conditions existed which might lead to fraud.

48. Koss is informed and believes and thereon alleges that Grant Thornton, at the direction of partner Koeppel, prepared and transmitted to Koss a SAS 60 Internal Control Letter dated June 20, 2006, recklessly and/or falsely stating, among other things, that "upon review of the Company's internal controls, overall controls appear to be designed effectively."

49. Koss is informed and believes and thereon alleges that Grant Thornton partners Koeppel and Altschaefl presented Grant Thornton's "Report to the Audit Committee of the Board of Directors" of Koss on August 30, 2006. At that time, Grant Thornton partners Koeppel and Altschaefl met with the members of the Koss Audit

Committee and recklessly and/or falsely made the following representations which were intended for the Koss Board of Directors, Audit Committee and management when made:

- Grant Thornton was in agreement with the Company's reported financial information for fiscal 2006 and would issue an unqualified opinion on those statements.

- There were no material errors, material irregularities or possible illegal acts that came to Grant Thornton's attention.

- There were no material weaknesses in internal accounting control at Koss.

- Koss' books and accounts and other records, were satisfactorily maintained and the accounting methods employed are satisfactorily applied within the limits of generally accepted accounting standards.

50.     On August 30, 2006, Grant Thornton issued its report recklessly and/or falsely stating, among other things, as follows:

"We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)."

"In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of KOSS CORPORATION and subsidiaries as of June 30, 2006 and 2005, and the results of their operations and their cash flows for the years ended June 30, 2006 in conformity with accounting principles generally accepted in the United States of America."

51.     In reliance on the audit report and opinion issued by Grant Thornton, Koss incorporated Grant Thornton's audit report and opinion into Koss' Form 10-K Annual

Report, with Grant Thornton's consent, and filed it with the United States Securities and Exchange Commission for the fiscal year ended June 30, 2006.

## Misrepresentations in Connection with the Fiscal Year 2007 Audit

52.    On October 9, 2006, Grant Thornton partner Koeppel recklessly and/or falsely made representations to Thomas L. Doerr, Chairman of the Audit Committee of Koss, through the Grant Thornton engagement letter, regarding the fiscal year 2007 audit, including but not limited to, the following:

- Grant Thornton's audit of Koss would be conducted in accordance with PCAOB Standards.

- Grant Thornton's audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant judgment and estimates made by management, as well as evaluating the overall financial statement presentation.

- That reasonable assurance from Grant Thornton that Koss' financial statements are free of material misstatement, whether caused by error or fraud, is a "high level of assurance."

- That Grant Thornton would perform audit procedures on any financial statements schedules that were required to be included in certain Company filings with the U.S. Securities Exchange Commission and the purpose of this auditing procedure would be to determine whether these schedules, when considered in relation to the basic financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

- That Grant Thornton, as the Company's auditors, would perform an audit of internal control over financial reporting and render a report expressing an opinion on both management's assessment of the effectiveness of internal

control over financial reporting and directly on the effectiveness of internal control over financial reporting.

- That Grant Thornton would advise Koss of fraud involving senior management and fraud that caused material misstatements of the financial statements, which came to the attention of the auditors.

- That Grant Thornton would advise Koss of illegal acts, which came to the attention of the auditors.

53. On July 18, 2007, Koss Audit Committee members Thomas Doerr, Chairman, Larry Mattson, Ted Nixon and John Stollenwerk participated in a meeting with Grant Thornton, attended by Grant Thornton auditors Koeppel, Altschaefl, Jeff Bradford, and Sabrina Yatckoske. The purpose of the meeting was for Grant Thornton to discuss any issues the auditors felt needed to be brought to the attention of Koss' Audit Committee. Grant Thornton auditors Bradford, Yatckoske, Koeppel and Altschaefl recklessly and/or falsely represented to the Audit Committee that the fiscal 2007 audit was essentially complete and that they intended to issue an unqualified opinion on Koss.

54. Koss is informed and believes and thereon alleges that on August 15, 2007, an update conference call was held between members of the Koss Audit Committee and Grant Thornton to discuss the "Fiscal 2007 Audit Results," which was prepared in writing and provided to the Koss Audit Committee in connection with the call. At that time, Grant Thornton recklessly and/or falsely made the following representations which were intended for the Koss Board of Directors, Audit Committee and management when made:

- Grant Thornton was in agreement with the Company's reported financial information for the year ended June 30, 2007 (fiscal 2007) and would issue an unqualified opinion on those statements.

- No material errors, material irregularities or possible material illegal acts came to the attention of Grant Thornton.

55. On August 17, 2007, Grant Thornton issued its report recklessly and/or falsely stating, among other things, as follows:

> "We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)."

> "In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of KOSS CORPORATION and subsidiaries as of June 30, 2007 and 2006, and the results of their operations and their cash flows for each of the three years in the period ended June 30, 2007 in conformity with accounting principles generally accepted in the United States of America."

56. In reliance on the audit report and opinion issued by Grant Thornton, Koss incorporated Grant Thornton's audit report and opinion into Koss' Form 10-K Annual Report, with Grant Thornton's consent, and filed it with the United States Securities and Exchange Commission for the fiscal year ended June 30, 2007.

## Misrepresentations in Connection with the Fiscal Year 2008 Audit

57. On August 24, 2007, Grant Thornton partner Koeppel recklessly and/or falsely made representations to Thomas Doerr, Chairman of the audit Committee of Koss, through the Grant Thornton engagement letter, regarding the fiscal year 2008 audit, including but not limited to, the following:

- Grant Thornton's audit of Koss would be conducted in accordance with PCAOB Standards.

- Grant Thornton's audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant judgment and estimates made by management, as well as evaluating the overall financial statement presentation.

- That reasonable assurance from Grant Thornton that Koss' financial statements are free of material misstatement, whether caused by error or fraud, is a "high level of assurance."

- That Grant Thornton would perform audit procedures on any financial statements schedules that were required to be included in certain Company filings with the U.S. Securities Exchange Commission and the purpose of this auditing procedure would be to determine whether these schedules, when considered in relation to the basic financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

- That Grant Thornton, as the Company's auditors, would perform an audit of internal control over financial reporting and render a report expressing an opinion on both management's assessment of the effectiveness of internal control over financial reporting and directly on the effectiveness of internal control over financial reporting.

58.     On May 8, 2008, Koss Audit Committee members Thomas Doerr, Chairman, Larry Mattson, Ted Nixon and John Stollenwerk participated in a meeting with Grant Thornton attended in-person by Grant Thornton auditors Koeppel and Sabrina Yatckoske. The purpose of the meeting was for Grant Thornton to inform and outline for the Audit Committee the anticipated audit plan and completion date of the Fiscal year end

audit of Koss. Grant Thornton, through Koeppel and Yatckoske, prepared and presented to the Koss Audit Committee the "Fiscal 2008 Audit Plan." The Fiscal 2008 Audit Plan recklessly and/or falsely represented to Koss, among other things, that:

- Grant Thornton would assess the financial statement risks, including fraud risks, to determine where the threat of material misstatements is most likely to exist.

- Grant Thornton would approach the Koss audit with an understanding that fraud could occur in any company at any time and could be perpetrated by anyone.

- Grant Thornton would gather information of management and others within the organization about the risks of fraud.

- Grant Thornton would identify and assess specific risks of fraud and develop specific audit procedures to address the identified risks of fraud.

- Grant Thornton would perform mandatory procedures, regardless of specifically identified risks of fraud, to address the risk of management override of controls, including examining journal entries and other adjustments for evidence of possible material misstatement due to fraud; review accounting estimates for biases that could result in material misstatements due to fraud, including a retrospective review of significant prior-year estimates; and evaluate the business rationale of significant unusual transactions.

59. On July 16, 2008 a meeting was held between Koss Audit Committee members Thomas Doerr, Chairman, Larry Mattson, Ted Nixon, and John Stollenwerk, and Grant Thornton auditors Koeppel and Yatckoske, to discuss the "Preliminary Fiscal 2008 Audit Results," which was prepared in writing and provided to the Koss Audit Committee in connection with the meeting. At that time, Grant Thornton recklessly and falsely represented to the Koss Audit Committee, among other things, that:

- No material errors, material irregularities or possible material illegal acts had come to their attention.
- Grant Thornton intended to issue an unqualified opinion on Koss financials.
- No significant issues existed with management that needed to be addressed.
- Grant Thornton was unaware of any illegal acts or fraudulent activities.

60.    On August 20, 2008 a meeting was held between members of the Koss Audit Committee and Grant Thornton in connection with Grant Thornton's "Audit Committee Wrap Up Presentation" and to discuss the "Preliminary Fiscal 2008 Audit Results," which was prepared in writing and provided to the Koss Audit Committee in connection with the meeting.  At that time, Grant Thornton recklessly and/or falsely made the following representations which were intended for the Koss Board of Directors, Audit Committee and management when made:

- Grant Thornton was in agreement with the Company's reported financial information for the year ended June 30, 2008 and would issue an unqualified opinion on those statements.
- No material errors, material irregularities or possible material illegal acts came to the attention of Grant Thornton.

61.    On August 22, 2008, Grant Thornton issued its report recklessly and/or falsely stating, among other things, as follows:

"We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)."

"In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of KOSS CORPORATION

and subsidiaries as of June 30, 2008 and 2007, and the results of their operations and their cash flows for each of the three years in the period ended June 30, 2008 in conformity with accounting principles generally accepted in the United States of America."

62.    In reliance on the audit report and opinion issued by Grant Thornton, Koss incorporated Grant Thornton's audit report and opinion into Koss' Form 10-K Annual Report, with Grant Thornton's consent, and filed it with the United States Securities and Exchange Commission for the fiscal year ended June 30, 2008.

63.    Koss is informed and believes, and thereon alleges, that Grant Thornton's auditor's reports for the fiscal years ending June 30, 2004 through June 30, 2008 each contained the same or substantially similar representations which were reckless, false, misleading, inaccurate, and/or concealed material information.  Further, in representing that it audited in accordance with PCAOB and GAAS, Grant Thornton recklessly and/or falsely represented at least each of the following:

a.    The audit was performed by persons having adequate technical training and proficiency as an auditor (in compliance with section AU 150.02 and General Standard No. 1 of GAAS);

b.    Due professional care was exercised in the performance of the audit (in compliance with section AU 230 of GAAS);

c.    Grant Thornton had acquired a sufficient understanding of internal controls (in compliance with section AU 319 of GAAS);

d.    Grant Thornton had acquired sufficient, competent evidential matter to support its audit opinion (in compliance with section AU 326 of GAAS);

e.  Grant Thornton had used appropriate professional·skepticism with
    respect to gathering competent evidential matter (in compliance with
    section AU 230 of GAAS);

f.  The report and opinion of Grant Thornton truthfully and accurately
    stated whether financial·statements were prepared in accordance with
    GAAP (in compliance with section AU 410 of GAAS);

g.  Grant Thornton was properly independent (in compliance with section AU
    220 of GAAS);

h.  Grant Thornton had appropriately planned and performed its audit to
    obtain reasonable assurance of the risk that the Koss financial statements
    were free of material misstatement, whether through error or fraud in
    compliance with section AU 316 of GAAS);

i.  Grant Thornton had properly followed and interpreted professional
    standard QC Section 20 - System of Quality Control for a CPA Firm's
    Accounting and Auditing Practice;

j.  Grant Thornton had created and provided relevant and adequate internal
    guidance, practices, policies and procedures as required by professional
    standard QC Section 20.20(a);

k.  Grant Thornton had created and provided appropriate firm guidance
    materials and practice aids as required by professional standard QC
    Section 20.20(b); and

l.  Grant Thornton had ensured compliance with firm policies and
    procedures as required by professional standard QC Section 20.20(d).

64.  As set forth more particularly herein, these representations made by Grant
Thornton were reckless, false, misleading, inaccurate and concealed material information
including, without limitation, that:

a.      Grant Thornton did not plan, or conduct, its audits in accordance with the PCAOB and GAAS.

b.      Grant Thornton did not fairly and accurately express its opinion, supported by competent evidential matter, as is required by GAAS, that the Company's financial statements conformed with GAAP.

c.      Grant Thornton knew of, and/or recklessly disregarded, and/or negligently failed to apprehend, material deficiencies in Koss' internal control structure and system.

d.      Grant Thornton did not plan, or conduct, its audits to obtain reasonable assurances as to whether the financial statements were free of material misstatement.

e.      Grant Thornton did not appropriately inform the Koss Audit Committee and the Board of Directors about several material accounting issues..

f.      Grant Thornton did not adequately communicate material weaknesses and reportable conditions to the Audit Committee and Board of Directors of Koss, whether by management letter or otherwise.

65.      Grant Thornton made each of the foregoing representations with reckless disregard for their truth, without knowing whether they were true or false, and/or without a reasonable basis for making the representations, and/or concealed or suppressed one or more important facts, for the purpose of inducing Koss, through its Board of Directors, Audit Committee, officers, attorneys and/or others, to rely upon the statements, and to act, or refrain from acting, based upon that reliance.

66.      The Koss Board of Directors, Audit Committee and others were unaware of the recklessness and/or falsity of the representations made by Grant Thornton and

believed them to be true and acted in justifiable reliance upon those representations including, without limitation, electing not to undertake any further investigation designed to uncover financial fraud, embezzlement or criminal activity by employees, including Sachdeva, and further to file the above-mentioned audit reports with the U.S. Securities and Exchange Committee.

67.    As a direct, proximate and foreseeable result of the inaccurate, fraudulent, false, misleading and/or reckless representations of Grant Thornton, as alleged herein, Koss has suffered actual damages in an amount in excess of thirty million dollars, the exact amount to be proven at trial.

68.    Plaintiff is informed and believes and thereon alleges (i) that Grant Thornton, through its partners Koeppel and Altschaefl, who possessed managerial authority by virtue of their status a partners, and who were acting within the course and scope of their employment and the course and scope of Grant Thornton's audit engagement for fiscal year 2004 through fiscal year 2008, authorized the reckless and/or false representations made to Koss' Audit Committee and the Board of Directors; (ii) that partners Koeppel and Altschaefl, who were responsible for the fiscal year 2004 through fiscal year 2008 audits, were unfit to plan, perform and/or review audits and Grant Thornton was reckless in employing and continuing to employ them; and (iii) partners or persons employed by Grant Thornton possessing managerial authority (who are known to Grant Thornton but presently unknown to Koss) ratified and approved the reckless and/or false statements. The foregoing reckless and/or false representations were fraudulent, willful and wanton and proximately caused Koss damage. Koss, on that basis, and in the interests of justice and as required to serve the public good, requests an award of punitive/exemplary damages in an amount that will punish Grant Thornton and discourage it and others from similar conduct.

## COUNT THREE

## AGAINST DEFENDANT GRANT THORNTON FOR NEGLIGENT MISREPRESENTATION

69. Plaintiff incorporates by reference in full the allegations set forth above in paragraphs 1 through 29.

70. Grant Thornton, as an independent auditing firm auditing the financial statements of Koss, assumed the role of a "watchdog." Accordingly, Grant Thornton had a duty to make full, prompt and complete disclosure of any material issue to the Koss Board of Directors and Audit Committee.

71. In addition to Grant Thornton's duty of disclosure as an auditor, because Grant Thornton spoke and made representations with respect to its reports and audits, and with respect to the accounting systems, accounting controls, business operations and financial statements of Koss, Grant Thornton had a duty to speak truthfully, accurately and completely regarding all aspects of its reports and audits and Koss' accounting systems, accounting controls, business operations and financial statements and make full and fair disclosure of all items in connection therewith. Having spoken with respect to these topics, Grant Thornton assumed the duty to speak truthfully, accurately and completely, and the duty not to suppress, omit or conceal any material fact in connection therewith.

72. Grant Thornton also had a continuing duty to disclose any material information that it knew, or suspected, which formed a reasonable basis to indicate that there was a material problem with (i) Koss' operations or accounting systems and controls; (ii) the accuracy of the Company's financial statements; (iii) Koss' ability to

properly authorize, issue, document, monitor and/or account for its funds in connection with the use of cashier's checks, wire transfers, traveler's checks and manual checks; (iv) Koss' ability to protect its assets and goodwill; and/or (v) the honesty, veracity and competence of Sachdeva.

73. Grant Thornton recklessly disregarded, or was negligent and careless in not apprehending, significant issues at Koss, including the manipulation and fraudulent use of cashier's checks, wire transfers, traveler's checks and manual checks by Sachdeva, and the concomitant waste, diversion and damage to Koss in material monetary amounts.

74. In its oral and/or written reports or statements, Grant Thornton negligently made false, reckless and/or misleadingly incomplete representations and/or negligently failed to state material facts concerning, *inter alia*, without limitation:

   a. whether corporate employees such as Sachdeva were manipulating cashier's checks, wire transfers, traveler's checks, and manual checks for their own personal benefit;

   b. whether the systems of controls of Koss were sufficient to ensure that its funds were not embezzled and diverted by Sachdeva;

   c. the internal controls of Koss;

   d. the financial condition of Koss;

   e. the financial statements of Koss;

   f. the risk of accounting error and irregularity in Koss' statements arising out of, at least in part, the internal control system existing at the Company;

   g. Koss' ability to account properly for material transactions in accordance with GAAP;

-51-

h.   whether Koss' financial statements were prepared in accordance with GAAP;

i.   whether Grant Thornton's audits were conducted in accordance with GAAS; and

j.   the performance by Grant Thornton in providing audit services and the manner in which it discharged its contractual obligations to Koss.

75.   Grant Thornton negligently and carelessly made false representations concerning, and/or negligently and carelessly failed to state material facts about, past and existing material aspects of the operations, internal and accounting controls, management, policies, procedures, transactions, financial statements, and the financial position of Koss. The false representations made by Grant Thornton included, without limitation, false statements regarding (1) whether Grant Thornton intended to, and did, plan and conduct its audits of the Koss financial statements in accordance with GAAS; (2) whether Koss' financial statements were presented fairly in conformity with GAAP; (3) whether those financial statements were free from material misstatement; and, (4) whether the system of internal accounting controls at Koss was adequate.

76.   Even though Grant Thornton knew of, and/or recklessly disregarded, and/or negligently and carelessly failed to apprehend, the material issues described elsewhere herein, Grant Thornton did not disclose or discuss any of these issues with the Koss Board of Directors.

## Misrepresentations in Connection with the Fiscal Year 2004 Audit

77.   Koss is informed and believes and thereon alleges that Grant Thornton partner Melissa K. Koeppel ("Koeppel") was the partner in charge of the fiscal year 2004 audit performed by Grant Thornton for Koss. Grant Thornton partner Mike Altschaefl ("Altschaefl") was the concurring partner in connection with the audit performed by Grant Thornton for Koss. Koeppel and Altschaefl presented Grant Thornton's "Report to the Audit Committee of the Board of Directors" of Koss on July 21, 2004. At that time, Grant Thornton partners Koeppel and Altschaefl met with the members of the Koss Audit Committee and negligently and carelessly made the following false representations which were intended for the Koss Board of Directors, Audit Committee and management when made:

- Grant Thornton was in agreement with the Company's reported financial information for fiscal 2004 and Grant Thornton would issue an unqualified opinion in connection with those statements.
- There were no material errors, material irregularities or possible illegal acts that came to Grant Thornton's attention.
- There were no material weaknesses in internal accounting control at Koss.
- Koss' books and accounts and other records, were satisfactorily maintained and the accounting methods employed are satisfactorily applied within the limits of generally accepted accounting standards.

78.   On July 9, 2004, Grant Thornton issued its report and negligently and carelessly made the following false representations:

"We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States)."

"In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of KOSS CORPORATION and subsidiaries as of June 30, 2004, and the results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America."

79.     In reliance on the audit report and opinion issued by Grant Thornton, Koss incorporated Grant Thornton's audit report and opinion into Koss' Form 10-K Annual Report, with Grant Thornton's consent, and filed it with the United States Securities and Exchange Commission for the fiscal year ended June 30, 2004.

## Misrepresentations in Connection with the Fiscal Year 2005 Audit

80.     On October 1, 2004, Grant Thornton partner Koeppel negligently and carelessly made false representations to Lawrence Mattson, Chairman of the Audit Committee of Koss, through the Grant Thornton engagement letter, regarding the fiscal year 2005 audit, including but not limited to, the following:

- Grant Thornton's audit of Koss would be conducted in accordance with PCAOB Standards.

- Grant Thornton's audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant judgment and estimates made

by management, as well as evaluating the overall financial statement presentation.

- That reasonable assurance from Grant Thornton that Koss' financial statements are free of material misstatement, whether caused by error or fraud, is a "high level of assurance."

- That Grant Thornton would perform audit procedures on any financial statements schedules that were required to be included in certain Company filings with the U.S. Securities Exchange Commission and the purpose of this auditing procedure would be to determine whether these schedules, when considered in relation to the basic financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

- That Grant Thornton, as the Company's auditors, would perform an audit of internal control over financial reporting and render a report expressing an opinion on both management's assessment of the effectiveness of internal control over financial reporting and directly on the effectiveness of internal control over financial reporting.

- That Grant Thornton would advise Koss of fraud involving senior management and fraud that caused material misstatements of the financial statements, which came to the attention of the auditors.

- That Grant Thornton would advise Koss of illegal acts, which came to the attention of the auditors.

81.     Koss is informed and believes and thereon alleges that Koeppel and Altschaefl presented Grant Thornton's "Report to the Audit Committee of the Board of Directors" of Koss on July 20, 2005. At that time, Grant Thornton partners Koeppel and Altschaefl met with the members of the Koss Audit Committee and negligently and

carelessly made the following reckless and/or false representations, which were intended for the Koss Board of Directors, Audit Committee and management when made:

- Grant Thornton was in agreement with the Company's reported financial information for fiscal 2005 and, upon successful completion of the remainder of the audit work, would issue an unqualified opinion on those statements.

- There were no material errors, material irregularities or possible illegal acts that came to Grant Thornton's attention.

- There were no material weaknesses in internal accounting control at Koss.

- Koss' books and accounts and other records, were satisfactorily maintained and the accounting methods employed are satisfactorily applied within the limits of generally accepted accounting standards.

82.     On September 28, 2005, Grant Thornton negligently and carelessly represented to Koss in its letter to "Management and the Audit Committee of the Board of Directors," among other things, that:

- Grant Thornton was "not aware of any fraud or potential illegal acts that would cause a material misstatement of the financial statements."

- Grant Thornton "proposed no corrections to the financial statements that could, in our judgment, either individually or in the aggregate, have a significant effect on the Company's financial statements."

83.     On July 7, 2005, Grant Thornton issued its report and negligently and carelessly made the following false representations:

"We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)."

"In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of KOSS CORPORATION and subsidiaries as of June 30, 2005 and 2004, and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America."

84.     In reliance on the audit report and opinion issued by Grant Thornton, Koss incorporated Grant Thornton's audit report and opinion into Koss' Form 10-K Annual Report, with Grant Thornton's consent, and filed it with the United States Securities and Exchange Commission for the fiscal year ended June 30, 2005.

## Misrepresentations in Connection with the Fiscal Year 2006 Audit

85.     On October 1, 2005, Grant Thornton partner Koeppel negligently and carelessly made false representations to Lawrence Mattson, Chairman of the audit Committee of Koss, through the Grant Thornton engagement letter, regarding the fiscal year 2006 audit, including but not limited to, the following:

- Grant Thornton's audit of Koss would be conducted in accordance with PCAOB Standards.
- Grant Thornton's audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant judgment and estimates made by management, as well as evaluating the overall financial statement presentation.

- That reasonable assurance from Grant Thornton that Koss' financial statements are free of material misstatement, whether caused by error or fraud, is a "high level of assurance."

- That Grant Thornton would perform audit procedures on any financial statements schedules that were required to be included in certain Company filings with the U.S. Securities Exchange Commission and the purpose of this auditing procedure would be to determine whether these schedules, when considered in relation to the basic financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

- That Grant Thornton, as the Company's auditors, would perform an audit of internal control over financial reporting and render a report expressing an opinion on both management's assessment of the effectiveness of internal control over financial reporting and directly on the effectiveness of internal control over financial reporting.

- That Grant Thornton would advise Koss of fraud involving senior management and fraud that caused material misstatements of the financial statements, which came to the attention of the auditors.

- That Grant Thornton would advise Koss of illegal acts, which came to the attention of the auditors.

86.    Koss is informed and believes and thereon alleges that Grant Thornton partners Koeppel and Altschaefl and Engagement Manager Sabrena Yatckoske met with the members of the Koss Audit Committee on May 8, 2006, and at that time negligently and carelessly represented to the members of the Audit Committee that Grant Thornton knew of no fraud in Koss and had no reason to believe that conditions existed which might lead to fraud.

87.    Koss is informed and believes and thereon alleges that Grant Thornton, at the direction of partner Koeppel, prepared and transmitted to Koss a SAS·60 Internal Control Letter dated June 20, 2006, negligently and carelessly stating, among other things, that "upon review of the Company's internal controls, overall controls appear to be designed effectively."

88.    Koss is informed and believes and thereon alleges that Grant Thornton partners Koeppel and Altschaefl presented Grant Thornton's "Report to the Audit Committee of the Board of Directors" of Koss on August 30, 2006. At that time, Grant Thornton partners Koeppel and Altschaefl met with the members of the Koss Audit Committee and negligently and carelessly made the·following representations which were intended for the Koss Board of Directors, Audit Committee and management when made:

- Grant Thornton was in agreement with the Company's reported financial information for fiscal 2006 and would issue an unqualified opinion on those statements.
- There were no material errors, material irregularities or possible illegal acts that came to Grant Thornton's attention.
- There were no material weaknesses in internal accounting control at Koss.
- Koss' books and accounts and other records, were satisfactorily maintained and the accounting methods employed are satisfactorily applied within the limits of generally accepted accounting standards.

89.    On August 30, 2006, Grant Thornton issued its report and negligently and carelessly made the following false representations:

"We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)."

"In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of KOSS CORPORATION and subsidiaries as of June 30, 2006 and 2005, and the results of their operations and their cash flows for the years ended June 30, 2006 in conformity with accounting principles generally accepted in the United States of America."

90.     In reliance on the audit report and opinion issued by Grant Thornton, Koss incorporated Grant Thornton's audit report and opinion into Koss' Form 10-K Annual Report, with Grant Thornton's consent, and filed it with the United States Securities and Exchange Commission for the fiscal year ended June 30, 2006.

## Misrepresentations in Connection with the Fiscal Year 2007 Audit

91.     On October 9, 2006, Grant Thornton partner Koeppel negligently and carelessly made false representations to Thomas L. Doerr, Chairman of the Audit Committee of Koss, through the Grant Thornton engagement letter, regarding the fiscal year 2007 audit, including but not limited to, the following:

- Grant Thornton's audit of Koss would be conducted in accordance with PCAOB Standards.
- Grant Thornton's audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant judgment and estimates made by management, as well as evaluating the overall financial statement presentation.

- That reasonable assurance from Grant Thornton that Koss' financial statements are free of material misstatement, whether caused by error or fraud, is a "high level of assurance."

- That Grant Thornton would perform audit procedures on any financial statements schedules that were required to be included in certain Company filings with the U.S. Securities Exchange Commission and the purpose of this auditing procedure would be to determine whether these schedules, when considered in relation to the basic financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

- That Grant Thornton, as the Company's auditors, would perform an audit of internal control over financial reporting and render a report expressing an opinion on both management's assessment of the effectiveness of internal control over financial reporting and directly on the effectiveness of internal control over financial reporting.

- That Grant Thornton would advise Koss of fraud involving senior management and fraud that caused material misstatements of the financial statements, which came to the attention of the auditors.

- That Grant Thornton would advise Koss of illegal acts, which came to the attention of the auditors.

92.     On July 18, 2007, Koss Audit Committee members Thomas Doerr, Chairman, Larry Mattson, Ted Nixon and John Stollenwerk participated in a meeting with Grant Thornton, attended by Grant Thornton auditors Koeppel, Altschaefl, Jeff Bradford, and Sabrina Yatckoske. The purpose of the meeting was for Grant Thornton to discuss any issues the auditors felt needed to be brought to the attention of Koss' Audit Committee. · Grant Thornton auditors Bradford, Yatckoske, Koeppel and Altschaefl

negligently and carelessly represented to the Audit Committee that the fiscal 2007 audit was essentially complete and that they intended to issue an unqualified opinion on Koss.

93. Koss is informed and believes and thereon alleges that on August 15, 2007, an update conference call was held between members of the Koss Audit Committee and Grant Thornton to discuss the "Fiscal 2007 Audit Results," which was prepared in writing and provided to the Koss Audit Committee in connection with the call. At that time, Grant Thornton negligently and carelessly made the following false representations which were intended for the Koss Board of Directors, Audit Committee and management when made:

- Grant Thornton was in agreement with the Company's reported financial information for the year ended June 30, 2007 (fiscal 2007) and would issue an unqualified opinion on those statements.

- No material errors, material irregularities or possible material illegal acts came to the attention of Grant Thornton.

94. On August 17, 2007, Grant Thornton issued its report and negligently and carelessly made the following false representations:

"We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)."

"In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of KOSS CORPORATION and subsidiaries as of June 30, 2007 and 2006, and the results of their operations and their cash flows for each of the three years in the period

ended June 30, 2007 in conformity with accounting principles generally accepted in the United States of America."

95.    In reliance on the audit report and opinion issued by Grant Thornton, Koss incorporated Grant Thornton's audit report and opinion into Koss' Form 10-K Annual Report, with Grant Thornton's consent, and filed it with the United States Securities and Exchange Commission for the fiscal year ended June 30, 2007.

## Misrepresentations in Connection with the Fiscal Year 2008 Audit

96.    On August 24, 2007, Grant Thornton partner Koeppel negligently and carelessly made false representations to Thomas Doerr, Chairman of the audit Committee of Koss, through the Grant Thornton engagement letter, regarding the fiscal year 2008 audit, including but not limited to, the following:

- Grant Thornton's audit of Koss would be conducted in accordance with PCAOB Standards.
- Grant Thornton's audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant judgment and estimates made by management, as well as evaluating the overall financial statement presentation.
- That reasonable assurance from Grant Thornton that Koss' financial statements are free of material misstatement, whether caused by error or fraud, is a "high level of assurance."
- That Grant Thornton would perform audit procedures on any financial statements schedules that were required to be included in certain Company filings with the U.S. Securities Exchange Commission and the purpose of this

auditing procedure would be to determine whether these schedules, when considered in relation to the basic financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

- That Grant Thornton, as the Company's auditors, would perform an audit of internal control over financial reporting and render a report expressing an opinion on both management's assessment of the effectiveness of internal control over financial reporting and directly on the effectiveness of internal control over financial reporting.

97.  On May 8, 2008, Koss Audit Committee members Thomas Doerr, Chairman, Larry Mattson, Ted Nixon and John Stollenwerk participated in a meeting with Grant Thornton attended in-person by Grant Thornton auditors Koeppel and Sabrina Yatckoske. The purpose of the meeting was for Grant Thornton to inform and outline for the Audit Committee the anticipated audit plan and completion date of the Fiscal year end audit of Koss. Grant Thornton, through Koeppel and Yatckoske, prepared and presented to the Koss Audit Committee the "Fiscal 2008 Audit Plan." The Fiscal 2008 Audit Plan negligently, carelessly, and falsely represented to Koss, among other things, that:

- Grant Thornton would assess the financial statement risks, including fraud risks, to determine where the threat of material misstatements is most likely to exist.

- Grant Thornton would approach the Koss audit with an understanding that fraud could occur in any company at any time and could be perpetrated by anyone.

- Grant Thornton would gather information of management and others within the organization about the risks of fraud.

- Grant Thornton would identify and assess specific risks of fraud and develop specific audit procedures to address the identified risks of fraud.

- Grant Thornton would perform mandatory procedures, regardless of specifically identified risks of fraud, to address the risk of management override of controls,

including examining journal entries and other adjustments for evidence of possible material misstatement due to fraud; review accounting estimates for biases that could result in material misstatements due to fraud, including a retrospective review of significant prior-year estimates; and evaluate the business rationale of significant unusual transactions.

98.     On July 16, 2008 a meeting was held between Koss Audit Committee members Thomas Doerr, Chairman, Larry Mattson, Ted Nixon, and John Stollenwerk, and Grant Thornton auditors Koeppel and Yatckoske, to discuss the "Preliminary Fiscal 2008 Audit Results," which was prepared in writing and provided to the Koss Audit Committee in connection with the meeting. At that time, Grant Thornton negligently, carelessly, and falsely represented to the Koss Audit Committee, among other things, that:

- No material errors, material irregularities or possible material illegal acts had come to their attention.
- Grant Thornton intended to issue an unqualified opinion on Koss financials.
- No significant issues existed with management that needed to be addressed.
- Grant Thornton was unaware of any illegal acts or fraudulent activities.

99.     On August 20, 2008 a meeting was held between members of the Koss Audit Committee and Grant Thornton in connection with Grant Thornton's "Audit Committee Wrap Up Presentation" and to discuss the "Preliminary Fiscal 2008 Audit Results," which was prepared in writing and provided to the Koss Audit Committee in connection with the meeting. At that time, Grant Thornton negligently and carelessly made the following false representations which were intended for the Koss Board of Directors, Audit Committee and management when made:

- Grant Thornton was in agreement with the Company's reported financial information for the year ended June 30, 2008 and would issue an unqualified opinion on those statements.

- No material errors, material irregularities or possible material illegal acts came to the attention of Grant Thornton.

100. On August 22, 2008, Grant Thornton issued its report and negligently and carelessly made the following false representations:

"We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)."

"In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of KOSS CORPORATION and subsidiaries as of June 30, 2008 and 2007, and the results of their operations and their cash flows for each of the three years in the period ended June 30, 2008 in conformity with accounting principles generally accepted in the United States of America."

101. In reliance on the audit report and opinion issued by Grant Thornton, Koss incorporated Grant Thornton's audit report and opinion into Koss' Form 10-K Annual Report, with Grant Thornton's consent, and filed it with the United States Securities and Exchange Commission for the fiscal year ended June 30, 2008.

102. Koss is informed and believes, and thereon alleges, that Grant Thornton's auditor's reports for the fiscal years ending June 30, 2004 through June 30, 2008 each contained the same or substantially similar representations which were negligent,

-66-

careless, reckless, false, misleading, inaccurate, and/or concealed material information. Further, in representing that it audited in accordance with PCAOB and GAAS, Grant Thornton negligently and carelessly represented in each instance at least each of the following:

a. The audit was performed by persons having adequate technical training and proficiency as an auditor (in compliance with section AU 150.02 and General Standard No. 1 of GAAS);

b. Due professional care was exercised in the performance of the audit (in compliance with section AU 230 of GAAS);

c. Grant Thornton had acquired a sufficient understanding of internal controls (in compliance with section AU 319 of GAAS);

d. Grant Thornton had acquired sufficient, competent evidential matter to support its audit opinion (in compliance with section AU 326 of GAAS);

e. Grant Thornton had used appropriate professional skepticism with respect to gathering competent evidential matter (in compliance with section AU 230 of GAAS);

f. The report and opinion of Grant Thornton truthfully and accurately stated whether financial statements were prepared in accordance with GAAP (in compliance with section AU 410 of GAAS);

g. Grant Thornton was properly independent (in compliance with section AU 220 of GAAS);

h. Grant Thornton had appropriately planned and performed its audit to obtain reasonable assurance of the risk that the Koss financial statements were free of material misstatement, whether through error or fraud in compliance with section AU 316 of GAAS);

i.  Grant Thornton had properly followed and interpreted professional standard QC Section 20 - System of Quality Control for a CPA Firm's Accounting and Auditing Practice;

j.  Grant Thornton had created and provided relevant and adequate internal guidance, practices, policies and procedures as required by professional standard QC Section 20.20(a);

k.  Grant Thornton had created and provided appropriate firm guidance materials and practice aids as required by professional standard QC Section 20.20(b); and

l.  Grant Thornton had ensured compliance with firm policies and procedures as required by professional standard QC Section 20.20(d).

103.  As set forth more particularly herein, including in Paragraph 27 above, these representations made by Grant Thornton were negligent, careless, reckless, false, misleading, inaccurate and concealed material information including, without limitation, that:

a.  Grant Thornton did not plan, or conduct, its audits in accordance with the PCAOB and GAAS.

b.  Grant Thornton did not fairly and accurately express its opinion, supported by competent evidential matter, as is required by GAAS, that the Company's financial statements conformed with GAAP.

c.  Grant Thornton knew of, and/or recklessly disregarded, and/or negligently failed to apprehend, material deficiencies in Koss' internal control structure and system.

d.  Grant Thornton did not plan, or conduct, its audits to obtain reasonable assurances as to whether the financial statements were free of material

misstatement.

 e. Grant Thornton did not appropriately inform the Koss Audit Committee and the Board of Directors about several material accounting issues.

 f. Grant Thornton did not adequately communicate material weaknesses and reportable conditions to the Audit Committee and Board of Directors of Koss, whether by management letter or otherwise.

104. Grant Thornton made each of the foregoing representations negligently and carelessly and as a result concealed or suppressed one or more important facts, which induced Koss, through its Board of Directors, Audit Committee, officers, attorneys and/or others, to rely upon the statements, and to act, or refrain from acting, based upon that reliance.

105. The Koss Board of Directors, Audit Committee and others were unaware of the negligence, carelessness, recklessness and/or falsity of the representations made by Grant Thornton and believed them to be true and acted in justifiable reliance upon those representations including, without limitation, electing not to undertake any further investigation designed to uncover financial fraud, embezzlement or criminal activity by employees, including Sachdeva, and further to file the above-mentioned audit reports with the U.S. Securities and Exchange Committee.

106. As a direct, proximate and foreseeable result of the negligent, careless, inaccurate, fraudulent, false, misleading and/or reckless representations of Grant Thornton, as alleged herein, Koss has suffered actual damages in an amount in excess of thirty million dollars, the exact amount to be proven at trial.

# COUNT FOUR

## AGAINST DEFENDANT SACHDEVA FOR FRAUD

107. Plaintiff incorporates by reference in full the allegations set forth above in paragraphs 1 through 106.

108. Sachdeva, as an officer of Koss, had a duty to refrain from embezzling money from the Company and to disclose and not conceal her fraudulent, illegal and tortious conduct from the Board of Directors. Defendant Sachdeva, notwithstanding, knowingly concealed from the Koss Board of Directors and Officers her embezzlement of Company funds through the improper use of cashier's checks, wire transfers, traveler's checks, and manual checks as described above. Sachdeva's conduct was designed exclusively to defraud Koss, to loot the Company and to line her own pockets for her own personal financial gain at the expense of Koss. Sachdeva caused the monies from Koss' accounts to be used for her own private purposes which were of no benefit to Koss and Koss in no way participated in or ratified her wrongful and fraudulent conduct.

109. Koss and its Officers and Board of Directors were unaware of Sachdeva's fraudulent conduct and reasonably relied upon, among other things, the audit reports issued by Grant Thornton indicating an unqualified "clean" opinion that Koss' financial statements were free of material misstatements due to fraud. Further, Koss and its Officers and Board of Directors reasonably relied on Grant Thornton and its auditors, whose responsibility it was to seek out, detect and report fraud at the Company, as well as the absence of any report from Grant Thornton that Sachdeva was involved in any fraudulent or illegal activity. At no time did Grant Thornton report or disclose Sachdeva's embezzlement.

110. Koss, in connection with Sachdeva's fraud and concealment, has sustained losses and damages in an amount in excess of thirty million dollars, with the exact amount to be proven at trial. Further, Sachdeva's conduct in this regard was fraudulent, willful and wanton and proximately caused Koss damages and losses. Koss, on that basis, and in the interests of justice and as required to serve the public good, requests an award of punitive/exemplary damages in an amount that will punish Sachdeva and discourage her and others from similar conduct.

## COUNT FIVE
## AGAINST DEFENDANT SACHDEVA FOR BREACH OF FIDUCIARY DUTY

111. Plaintiff incorporates by reference in full the allegations set forth above in paragraphs 1 through 110.

112. Sachdeva, as an officer of the Company, owed Koss numerous fiduciary duties including, among other things, duties of loyalty, fidelity, honesty, and integrity.

113. Sachdeva breached her fiduciary duties owed to Koss in that she embezzled, diverted and wasted funds belonging to the Company to enrich herself personally and to pay for her own personal expenses as described above.

114. Sachdeva's conduct was designed exclusively to defraud Koss, to loot the Company and to line her own pockets for her own personal financial gain at the expense of her employer, Koss. Koss was a victim of Sachdeva's breaches of fiduciary duties and in no way participated in or ratified her wrongful conduct.

115. Koss and its Officers and Board of Directors were unaware of Sachdeva's fraudulent conduct and reasonably relied upon, among other things, the audit reports issued by Grant Thornton indicating an unqualified "clean" opinion that Koss' financial statements were free of material misstatements due to fraud. Further, Koss and its Officers and Board of Directors reasonably relied on Grant Thornton and its auditors, whose responsibility it was to seek out, detect and report fraud at the Company, as well as the absence of any report from Grant Thornton that Sachdeva was involved in any fraudulent or illegal activity. At no time did Grant Thornton report or disclose Sachdeva's embezzlement. Koss was a victim of Sachdeva's breach of fiduciary duties and in no way participated in or ratified her wrongful conduct.

116. Koss, in connection with Sachdeva's fraud and concealment, has sustained losses and damages in an amount in excess of thirty million dollars, with the exact amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF KOSS CORPORATION accordingly and respectfully demands judgment in a sum of money in excess of Fifty Thousand ($50,000.00) Dollars, being the jurisdictional limit for the law division, against DEFENDANTS SUJATA SACHDEVA and GRANT THORNTON LLP as follows:

1. That Plaintiff be awarded compensatory damages in an amount to be determined at the time of trial;

2. That Plaintiff be awarded pre and post judgment interest in an amount to be determined at the time of trial;

3. That Plaintiff be awarded costs of suit incurred in connection with this action; and

4. That Plaintiff be awarded any such other and further relief to which it may be entitled as a matter of law and as deemed appropriate by this Court.

Respectfully submitted,

By: _____

Joseph A. Power, Jr.

Attorneys for Plaintiff:

Joseph A. Power, Jr.
Todd A. Smith
POWER ROGERS & SMITH, PC  #31444
70 W. Madison St., 55th FL.
Chicago, IL. 60602
312/236-9381

Michael J. Avenatti
Alexander L. Conti
EAGAN O'MALLEY & AVENATTI, LLP
450 Newport Center Drive, Second Floor
Newport Beach, CA 92660
949/706-7000

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT - LAW DIVISION

KOSS CORPORATION, a Delaware )
Corporation, )
                               )
       Plaintiff, )     No.
                               )
           v. )
                               )
SUJATA SACHDEVA, a natural person, )
and GRANT THORNTON, LLP, an Illinois )
Limited Liability Partnership, )
                               )
       Defendants. )

## AFFIDAVIT

I, JOSEPH A. POWER, JR., upon oath, deposes and states the following:

1.     That I am one of the attorneys for the Plaintiff, KOSS CORPORATION, in the above-entitled cause of action.

2.     That upon information and belief, the money damages in this cause of action will exceed $50,000.00.

POWER, ROGERS & SMITH, P.C.

By: _____
                     Joseph A. Power, Jr.

SUBSCRIBED and SWORN to before
me this 24 day of June 24, 2010
_____
       Notary Public

OFFICIAL SEAL
CAROLYN J BARTOLOTTA
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/04/14

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT - LAW DIVISION

KOSS CORPORATION, a Delaware )
Corporation, )
     )
    Plaintiff, )    No. 2010 L 007342
     )
    v. )
     )
     )
SUJATA SACHDEVA, a natural person, )
and GRANT THORNTON, LLP, an Illinois )
Limited Liability Partnership, )
     )
    Defendants. )

## Routine   ORDER

This cause coming on to be heard on Motion of Plaintiff, KOSS CORPORATION,

due notice having been given and the Court being fully advised in the premises;

    IT IS HEREBY ORDERED that Michael J. Avenatti, Alexander L. Conti, and Scott

H. Smith of the law firm of Eagan O'Malley & Avenatti, LLP are given leave to appear

before this Court in this case *pro hac vice.* as co-counsel for Plaintiff.

              ENTERED:    **JUDGE LEE PRESTON**

                               AUG 11 2010
                    JUDGE
                               Circuit Court - 1852

              DATED: _____

Joseph A. Power, Jr.
Todd A. Smith
POWER, ROGERS & SMITH, P.C. #31444
Attorneys for Plaintiff
70 W. Madison St., 55th FL.
Chicago, IL. 60602
312/236-9381
Fax No. 312/236-0920



6249-18

2012 IL App (1st) 120379

No. 1-12-0379

| | |
|---|---|
| KOSS CORPORATION, ) | |
| ) | Appeal from the |
| Plaintiff-Appellant, ) | Circuit Court of |
| ) | Cook County. |
| v. ) | |
| ) | No. 10 L 7342 |
| SUJATA SACHDEVA, ) | |
| ) | Honorable |
| Defendant ) | Bill Taylor, |
| ) | Judge Presiding. |
| ) | |
| (Grant Thornton, LLP, ) | |
| ) | |
| Defendant-Appellee). ) | |

PRESIDING JUSTICE ROBERT E. GORDON delivered the judgment of the court, with opinion.
Justices Lampkin and Palmer concurred in the judgment and opinion.

## OPINION

¶ 1    After plaintiff Koss Corporation's senior vice-president, Sujata Sachdeva, was accused of

embezzling approximately $34 million from Koss between 2004 to 2008, Koss brought claims of

negligence, fraud, and negligent misrepresentation against defendant Grant Thornton, LLP

(Thornton), Koss's auditor during this period of time.

¶ 2    The trial court granted Thornton's motion to dismiss on the ground of *forum non*

*conveniens* in favor of an action in Milwaukee County, Wisconsin. This appeal followed.

¶ 3    For the reasons discussed below, we find that the trial court abused its discretion by



granting Thornton's motion to dismiss on *forum non conveniens* grounds. First, the trial court

overlooked a significant portion of Koss's factual allegations in making its analysis. The case at

bar arose out of two distinct sets of factual claims. Koss alleges that: (1) Thornton's auditing

team failed to discover the embezzlement in its audits of Koss during the fiscal years ending June

30, 2004, through June 30, 2008; and (2) inadequate firm-wide policies, procedures, and auditor

training established by corporate headquarters led to the inadequate audits. Second, although

many relevant witnesses reside in Wisconsin and the alleged embezzlement and audits all took

place in Wisconsin, many relevant witnesses also reside or work in Cook County and Thornton is

headquartered there. Third, most of the documentary evidence is online and thus is equally

accessible in Milwaukee and Chicago. Fourth, the other private and public factors do not favor

transfer. Last, we take judicial notice that Milwaukee is only an hour and a half's drive from

downtown Chicago. Ill. R. Evid. 201(b) (eff. Jan. 1, 2011).[1] Given these facts, and considering

that Thornton has the burden to prove that the relevant factors strongly favor transfer, we find

that the trial court abused its discretion and should have denied the motion to dismiss for *forum

non conveniens*.

¶ 4                 BACKGROUND

¶ 5                 I. The Parties

¶ 6    Plaintiff Koss Corporation (Koss) is a public corporation whose principal place of

---

[1] "(b) Kinds of Facts. A judicially noticed fact must be one not subject to reasonable

dispute in that it is *** (1) generally known within the territorial jurisdiction of the trial

court ***." Ill. R. Evid. 201(b) (eff. Jan. 1, 2011).

business is in Milwaukee, Wisconsin. Koss markets and manufactures stereo headphones and related accessory products.

¶ 7    Defendant Thornton is a corporate public accounting firm with its principal place of business in Chicago, Illinois. Thornton has offices in 26 states. In addition to its headquarters in Chicago, Thornton has Illinois offices in Oakbrook Terrace and Schaumburg. Thornton's Wisconsin offices are located in Milwaukee, Madison, and Appleton.

¶ 8                          II. The Claims in the Complaint

¶ 9    There is no dispute that during the fiscal years ending June 30, 2004, through June 30, 2008, Koss's former vice president of finance, Sujata Sachdeva, embezzled more than $30 million from Koss. Sachdeva pleaded guilty to wire fraud charges in the United States District Court for the Eastern District of Wisconsin on July 16, 2010.

¶ 10   The complaint alleges that during the years in which Sachdeva embezzled the funds, Koss engaged Thornton to audit Koss's financial statements and to conduct reviews of Koss's unaudited quarterly financial statements and they failed to disclose the embezzlement.

¶ 11   In the case at bar, Koss filed a three-count complaint in Cook County, Illinois, against Thornton for (1) professional negligence, (2) fraud and deceit, and (3) negligent misrepresentation. These counts arose out of two distinct sets of factual claims. First, Koss alleges that Thornton's auditing team failed to discover the embezzlement in its audits of Koss during the fiscal years ending June 30, 2004, through June 30, 2008. Second, Koss alleges that inadequate firm-wide policies, procedures, and auditor training established by Thornton's corporate headquarters led to the inadequate audits.

¶ 12           III. *Forum Non Conveniens* Motion and Related Discovery

¶ 13     On October 25, 2010, Thornton moved to dismiss Koss's complaint pursuant to Illinois

Supreme Court Rule 187 based on the doctrine of *forum non conveniens*. Ill. S. Ct. R. 187 (eff.

Aug. 1, 1986). The trial court granted leave to conduct discovery relating to Thornton's motion to

dismiss prior to deciding the issue. Koss propounded written interrogatories and document

requests, and served deposition notices upon Thornton. The following people were deposed:

Melissa Koeppel, a Thornton partner; Amy Henselin, Thornton's corporate representative in this

case; and Meg Hafer, human resources manager at Thornton in Milwaukee. On January 10, 2012,

the trial court granted Thornton's motion to dismiss. This appeal followed.

¶ 14                         IV. Summary of Discovery

¶ 15     Koss avers in its attorney's affidavit submitted in response to Thornton's *forum non*

*conveniens* motion claims that Thornton's national headquarters located in downtown Chicago is

91.3 miles from the courthouse in Milwaukee County. The affidavit also provides 2009 statistics

that in Cook County, more cases were disposed of than newly filed, and in Milwaukee County,

more cases were opened than disposed of. However, these numbers tell us nothing about the

relative speed with which these two counties could handle a complex case. Thornton avers in its

attorney's affidavit in support of its motion to dismiss that both Koss and Thornton retained

attorneys in Illinois and Wisconsin to litigate this case.

¶ 16     Since we find that the trial court overlooked Koss's factual claim concerning Thornton's

firm-wide policies and training, the discovery below is organized into the two distinct factual

claims: the auditing team's failure to uncover the embezzlement, and the corporate headquarters'

4

failure to implement adequate policies and train its auditors.

¶ 17      A. Claims Concerning the Audits and the Embezzlement

¶ 18              1. Potential Witnesses

¶ 19    Melissa Koeppel, a partner at Thornton, avers the following in her affidavit:

¶ 20    Koeppel was the Thornton partner in charge of the Koss audit during the fiscal years

ending June 30, 2004, through June 30, 2008. Koeppel resides in Brookfield, Wisconsin, and has

maintained an office in Thornton's downtown Chicago office since April 2011, as well as the

Milwaukee office.

¶ 21    The individuals who performed the Koss audits are called the Koss engagement team.

The Koss engagement team comprised a total of 18 Thornton employees during the fiscal years

ending June 30, 2004 through June 30, 2008. The engagement team worked out of Thornton's

Milwaukee office, and 17 members reside in Wisconsin. Three reside in Milwaukee. Fourteen

reside in other cities closer to Milwaukee than Chicago. One resides in New York.

¶ 22    Thornton's audits and reviews of Koss were planned and performed in Milwaukee,

Wisconsin.

¶ 23    Other Thornton professionals who were not engagement team members also billed time

to the Koss audits. Thornton calls these employees "other timekeepers."

¶ 24    Thornton provided the following in its responses to written interrogatories:

¶ 25    Three of the other timekeepers reside in Illinois: Mark Scoles is a Thornton partner and

billed time to Koss in 2004. Scoles resides in Naperville, Illinois. Robert B. Emkow, a former

senior manager, also billed time to Koss in 2004. Emkow resides in Park Ridge, Illinois. Emily

Pratt, a former senior associate, also billed time to Koss in 2004, and resides in Chicago.

¶ 26   Thornton's corporate representative in this case, Amy Henselin, testified as to the following in her deposition:

¶ 27   The other timekeepers on the Koss audits provided support to the engagement team, for example, consulting on specific matters.

¶ 28   Wisconsin auditors have regularly travelled to Chicago and elsewhere in Illinois for other audit engagements, partnership interviews, and client meetings. Other than complaints about travel in general, no one has complained to Henselin that coming to Chicago is inconvenient.

¶ 29   Thornton named 15 current and former Koss directors, officers, and employees as subjects of potential testimony in its amended memorandum in support of its motion to dismiss. This list includes former employees Tracy Malone and Julie Mulvaney, who allegedly colluded in Sachdeva's embezzlement. Eight reside in Milwaukee County. Six reside in counties closer to Milwaukee than Chicago. One director resides in Kentucky.

¶ 30   Michael Koss averred the following in his affidavit in opposition to the motion for *forum non conveniens.*

¶ 31   The Koss directors, John Koss, John Stollenwoerk, Thomas Doerr, Theodore Nixon, Lawrence Mattson, and himself, are not inconvenienced by litigating this matter in Cook County. Koss will do what is necessary to ensure that the company's employees and members of its board are available to testify at trial, subject to any applicable objections other than those based on location or residence. Also, more than approximately 30 Koss shareholders reside in Illinois.[2]

---

[2] The record does not disclose the specific cities in Illinois in which they reside.

¶ 32    Koss's attorney in this case, Michael J. Avenatti, named in his affidavit in opposition to

the motion for *forum non conveniens* the following potential third-party witnesses in Illinois:

¶ 33    James J. Hess is the vice president of the Chicago branch of Bank of America (formerly

LaSalle Bank) from which Sachdeva made unauthorized wire transfers and withdrawals.

Carolann Gemski and Kara Washington are Securities and Exchange Commission (SEC)

attorneys who investigated Sachdeva. Donald Ryba was the SEC accountant on the case. The

SEC investigation was based in Chicago.

¶ 34    Thornton's attorney in this case, Frank B. Vanker, presented four potential third-party

witnesses in his affidavit in support of the motion for *forum non conveniens*.

¶ 35    James Malone was Sachdeva's employee who was paid with funds embezzled from Koss

and resides in Milwaukee. Baker Tilly Virchow Krause LLP (Baker Tilly)[3] was the accounting

firm that succeeded Thornton as Koss's auditor after Sachdeva's embezzlement was discovered.

Individual partners and employees of Baker Tilly who worked on the Koss audit reside in

Wisconsin and may be subjects of potential testimony. Specifically, Wayne T. Morgan is a

partner at Baker Tilly. Morgan resides in Waukesha, Wisconsin. Jefferson Wells[4] was the

accounting firm retained by Koss to investigate and assist in responses to Sachdeva's

embezzlement. Individual partners and employees of Jefferson Wells who provided such services

to Koss reside in Wisconsin and may be subjects of potential testimony.

¶ 36    In sum, although most Koss employees and most Thornton auditors who worked on the

---

[3] The record does not disclose the location of Baker Tilly.

[4] The record does not disclose the location of Jefferson Wells.

Koss audit reside in Wisconsin, there is no showing that these people would be inconvenienced by coming to Cook County. As detailed above, there are also potential third-party witnesses in Illinois.

¶ 37                                        2. Documentary Evidence

¶ 38     Frank B. Vanker, an attorney for Thornton, provided the following information in his affidavit in support of the motion for *forum non conveniens*.

¶ 39     Koss has made available 80 to 90 boxes of documents of accounting and business records in Milwaukee. Koss has posted more than 1 million pages of documents electronically to a secure Internet site. Thornton has electronically provided approximately 170,000 pages of documents, including audit and review work papers relating to Koss engagements.

¶ 40     Amy Henselin testified in her deposition that Thornton's servers are located in Oakbrook Terrace, Illinois; Thornton's auditors' e-mail and electronic audit work papers are located on these servers; the audit work papers also exist in hard copy in Thornton's local offices; and since most documentary evidence exists electronically, it should be readily available in either forum.

¶ 41               B. Claims Concerning Thornton's Policies, Procedures, and Training

¶ 42                                        1. Potential Witnesses

¶ 43                         a. Witnesses Concerning Thornton Policies and Procedures

¶ 44     Thornton provided the following responses to written interrogatories.

¶ 45     Eight Thornton employees were primarily responsible for reviewing or approving the issuance of audit manuals used in the review and audit services performed for Koss for fiscal years ending June 30, 2004 through June 30, 2008.

¶ 46    Five of these individuals reside in Illinois. John Archambault is the senior partner –
professional standards and global public policy. Archambault resides in Libertyville. Maria
Manasses is director, national professional standards group, and resides in Orland Park. Keith
Newton is the United States partner in charge of audit methodologies/auditing standards, and
resides in Oak Park. J.W. Starr is the former managing partner strategic services, and resides in
Chicago. Russell Wieman is the chief financial officer, and resides in Western Springs.

¶ 47    Jennifer Carney is the partner in charge of audit training and knowledge resources and is
the head of the group updating Thornton's audit manual and overseeing its audit training
materials, and resides in Lincoln, Nebraska. However, Amy Henselin testified in her deposition
that Carney works out of Thornton's Chicago office.

¶ 48    Henselin also testified to the following in her deposition.

¶ 49    Thornton's regional partner in charge of professional standards (RPPS), now called the
national professional standards partner, helps implement the firm's accounting and auditing
policies and is involved in risk management. Mark Scoles was the RPPS until 2008. Mike Santay
succeeded Scoles and was the RPPS at the time Koss discovered Sachdeva's embezzlement in
December 2009. Burt Fox succeeded Santay.

¶ 50    Thornton's responses to interrogatories state that Scoles, Santay, and Fox work out of
Thornton's Chicago office.

¶ 51    Meg Hafer, human resources manager at Thornton in Milwaukee, testified in her
deposition that the partner responsible for the Midwest region, Mike Hall, also has his office in
Chicago. Hall's role includes overseeing the regional offices' financials and personnel.

¶ 52   In sum, most potential witnesses concerning Thornton's firm-wide policies and procedures reside in Illinois.

¶ 53               b. Witnesses Concerning Thornton Training

¶ 54   Amy Henselin testified in her deposition that a majority of Thornton's national mandatory training for auditors from 2004 to 2011 took place at the Q Center in St. Charles, Illinois.

¶ 55   Michael J. Avenatti, Koss's attorney, provided the following in his affidavit in opposition to the motion for *forum non conveniens*.

¶ 56   Programs at the Q Center in St. Charles included core training for auditors and audit interns, audit leadership conferences, and audit senior development.

¶ 57   Koss engagement team members made a total of 33 trips to the Q Center between 2004 and 2008. Melissa Koeppel traveled to Cook County 78 times between 2004 and 2011 in connection with her work at Thornton. Other timekeepers on the Koss engagement took a total of 71 trips to the Q Center.

¶ 58   There are 37 individuals involved in Thornton's training programs who reside in Illinois. Jim Maurer is the national managing partner of strategic learning (the group responsible for creating teaching materials), and his office is in Chicago. Maria Taylor is the meeting team manager and a contact person for arranging Q Center training programs, and her office is in Oakbrook Terrace. Another 35 instructors from Illinois, among many from around the country, are involved in training auditors who worked on the Koss engagement.

¶ 59   Since several Thornton training programs occur in Illinois and several individuals involved in training Thornton auditors reside in Illinois, Illinois appears to be a relevant forum on

the factual claim of Thornton's policies, procedures, and auditor training.

¶ 60                    2. Documentary Evidence

¶ 61            a. Evidence Concerning Thornton Policies and Procedures

¶ 62    Amy Henselin testified to the following in her deposition.

¶ 63    Thornton's audit and assurance services manual (audit manual) sets forth the firm's

policies and procedures. The audit manual is updated annually and reflects Thornton's

interpretation and application of generally accepted auditing standards (GAAS). Thornton

auditors are required to follow the audit manual. Thornton's bulletins provide information on

upcoming pronouncements and changes to firm guidance. The bulletins also reflect Thornton's

interpretation and application of GAAS and must be followed by firm auditors.

¶ 64    The Grant electronic library stores Thornton's audit manuals, bulletins, and various

templates and practices. The Grant electronic library is maintained in Oakbrook Terrace. Updated

audit manuals, bulletins, and other materials are disseminated to auditors nationally from

Oakbrook Terrace as well.

¶ 65    Since these materials are disseminated nationally, they should be available in either

forum.

¶ 66                    b. Evidence Concerning Thornton Training

¶ 67    Michael J. Avenatti's affidavit in opposition to the motion to dismiss provided that the

final versions of training materials for instructors and participants of core training, audit

leadership conferences, and other national audit training are stored on servers in Oakbrook

Terrace.

¶ 68    In sum, documentary evidence both concerning Thornton policies and concerning Thornton training exists electronically, and should be accessible from either forum.

¶ 69                          C. Motion to Strike Testimony

¶ 70    On December 19, 2011, Koss file a notice of motion to strike portions of the affidavit of Meg Hafer, Thornton's human resources manager in its Milwaukee office, filed in support of Thornton's motion to dismiss for *forum non conveniens*. The motion concerns paragraphs 4, 5, 6, 7, 9, 11, 12, and 13. Koss alleges that Hafer's testimony in her deposition establishes that the evidence presented in these eight paragraphs of Hafer's affidavit "lacks foundation, lacks personal knowledge, and is inadmissible hearsay." Therefore, Koss argues, these paragraphs must be stricken.

¶ 71    The paragraphs in question averred that Hafer "reviewed" or "obtained" information presented in two exhibits that were attached to her affidavit. Exhibit 1 listed the roles, the counties of residence, the state that issued Certified Public Accountant (CPA) licenses, and the current Thornton employment status of the 18 engagement team members. Exhibit 2 listed the names and the counties of residence of 11 Koss directors, officers, and employees.

¶ 72    Paragraph 4 avers, "I reviewed Grant Thornton records pertaining to the 18 individuals whose roles are identified on Exhibit 1 and determined that 11 of the 18 individuals are former Grant Thornton partners or employees as indicated."

¶ 73    Paragraph 5 avers, "I obtained home addresses for each of the individuals listed on Exhibit 1 from Grant Thornton's records. Exhibit 1 accurately reflects the county that corresponds to the home addresses for each individual maintained in Grant Thornton's records."

¶ 74    Paragraph 6 avers, "I reviewed publicly available information to determine whether each individual listed on Exhibit 1 is currently licensed as a CPA in Wisconsin or in Illinois. Exhibit 1 accurately reflects whether each of the individuals is currently licensed as a CPA in Wisconsin or Illinois."

¶ 75    Paragraph 7 avers, "I reviewed information from the LexisNexis® Accurint® database to determine the counties in which the following individuals listed on Exhibit 2 maintain residences: Tracy Malone, Cheryl Mike, and John Koss, Sr. Exhibit 2 accurately reflects the county, or counties, included in the LexisNexis® Accurint® database where these individuals likely maintain residences."

¶ 76    Paragraph 9 avers, "I reviewed information from www.whitepages.com to determine the home addresses of the remaining individuals listed on Exhibit 2. Exhibit 2 accurately reflects the counties corresponding to the home addresses for these individuals obtained from www.whitepages.com."

¶ 77    Paragraph 11 avers, "It is my understanding, based upon inquiry, that copies of Grant Thornton's electronic work papers and hard copy work papers for Grant Thornton's Koss annual financial statement audits and Grant Thornton's quarterly reviews of Koss unaudited quarterly financial statements are accessible or located in Milwaukee."

¶ 78    Paragraph 12 avers, "Many Grant Thornton training materials are in electronic form and are accessible on-line in Grant Thornton's Milwaukee office."

¶ 79    Paragraph 13 avers, "Grant Thornton's current audit and assurance services manual is accessed on-line and is accessible in the Milwaukee office."

¶ 80    Hafer testified in her deposition that she did not personally contact the individuals listed in the exhibits or independently research the information listed. She testified that an attorney gave her the information from the databases, and she reviewed that information. Hafer testified that she "was able to access [current Thornton employee's] address[es] from our internal HR system."

¶ 81    On Jan. 10, 2012, the trial court denied Koss's motion to strike portions of Hafer's affidavit.

¶ 82                                    ANALYSIS

¶ 83    Thornton appeals the trial court's dismissal on *forum non conveniens* grounds. For the following reasons, we find that the trial court abused its discretion.

¶ 84                            I. Interlocutory Appeal

¶ 85    This is an interlocutory appeal, taken pursuant to Illinois Supreme Court Rule 306 (eff. Feb. 16, 2011). The rule provides in relevant part:

> "(a) A party may petition for leave to appeal to the
>
> Appellate Court from the following orders of the trial court:
>
> ***
>
> (2) from an order of the circuit court allowing or
>
> denying a motion to dismiss on the grounds of *forum non*
>
> *conveniens* ***." Ill. S. Ct. R. 306 (eff. Feb. 16, 2011).

¶ 86    March 9, 2012, this court granted Koss's petition for leave to appeal the trial court's dismissal on the grounds of *forum non conveniens.*

14

¶ 87                              II. *Forum Non Conveniens* Doctrine

¶ 88     *Forum non conveniens* is an "equitable doctrine founded in considerations of fundamental fairness and the sensible and effective administration of justice." *Langenhorst v. Norfolk Southern Ry. Co.*, 219 Ill. 2d 430, 441 (2006); *Gridley v. State Farm Mutual Automobile Insurance Co.*, 217 Ill. 2d 158, 169 (2005). This doctrine permits a trial court to transfer a case when a "trial in another forum 'would better serve the ends of justice.' " *Langenhorst*, 219 Ill. 2d at 441 (quoting *Vinson v. Allstate*, 144 Ill. 2d 306, 310 (1991)); *Gridley*, 217 Ill. 2d at 169.

¶ 89     The burden is on the party asking for the dismissal to show that the relevant factors "strongly favor" transfer. (Emphasis omitted.) *Langenhorst*, 219 Ill. 2d at 443 (quoting *Griffith v. Mitsubishi Aircraft International, Inc.*, 136 Ill. 2d 101, 108 (1990)); *Vivas v. The Boeing Co.*, 392 Ill. App. 3d 644, 656-57 (2009) (in product liability case where plane crash was in Peru with mostly Peruvian decedents, burden was still on defendant Boeing to show factors strongly favored transfer to Peru); *Woodward v. Bridgestone/Firestone, Inc.*, 368 Ill. App. 3d 827, 833 (2006) (in product liability case where a vehicle accident was in Australia with an Australian plaintiff, burden was still on defendant to show factors strongly favored transfer to Australia).

¶ 90                              III. Standard of Review

¶ 91     "A trial court is afforded considerable discretion in ruling on a *forum non conveniens* motion." *Langenhorst*, 219 Ill. 2d at 441. An appellate court will reverse a trial court's decision on a *forum non conveniens* motion only if the "defendants have shown that the circuit court abused its discretion in balancing the relevant factors." *Langenhorst*, 219 Ill. 2d at 442; *Gridley*, 217 Ill. 2d at 169; *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177 (2003). The Illinois

Supreme Court has stated: "A circuit court abuses its discretion in balancing the relevant factors only where no reasonable person would take the view adopted by the circuit court." *Langenhorst*, 219 Ill. 2d at 442; *Gridley*, 217 Ill. 2d at 169; *Dawdy*, 207 Ill. 2d at 177. The issue then is not what decision we would have reached if we were reviewing the facts on a clean slate, but whether the trial court acted in a way that no reasonable person would.

¶ 92                              IV. Preliminary Issues

¶ 93    Before we conduct our full *forum non conveniens* analysis, we must respond to three of Koss's arguments that could impact our review. First, Koss claims that the trial court abused its discretion because it overlooked a significant portion of the complaint. Second, Koss claims that the trial court abused its discretion because it did not hold Thornton to the correct evidentiary burden for a motion to dismiss for *forum non conveniens*. Third, Koss claims that the trial court abused its discretion when it denied a motion to strike portions of an affidavit that was allegedly not "factually sufficient." We now address each argument in turn.

¶ 94                           A. Scope of Koss's Complaint

¶ 95    Koss claims that the trial court abused its discretion because it did not consider the full scope of their complaint. First, Koss argues that the trial court overlooked a portion of the complaint and that this skewed the trial court's *forum non conveniens* analysis. Second, Koss argues that the trial court placed an unfair burden on it to take extensive discovery and prove up its entire case on a motion to dismiss for *forum non conveniens* motion. We will not respond to Koss's second argument because it has no effect on our analysis of to whether the trial court abused its discretion in granting Thornton's motion for *forum non conveniens*.

16

¶ 96    Koss's complaint alleges negligence, fraud, and negligent misrepresentations perpetrated by two distinct groups of people: (1) by Thornton's accountants who worked on Koss's engagement team and directly caused the alleged injury; and (2) by Thornton's corporate headquarters personnel who provided inadequate policies, procedures, and training to its accountants, which indirectly caused the alleged injury. In granting Thornton's motion to dismiss for *forum non conveniens*, the trial court order overlooked the second set of actors, stating "the allegations in the complaint surround auditing the books and records in Wisconsin and providing reports and representations pursuant to engagement letters executed in Wisconsin."

¶ 97    The case at bar is comparable to *Erwin v. Motorola, Inc.*, 408 Ill. App. 3d 261 (2011). *Erwin* involved a personal injury action that alleged birth defects caused by workers' exposure to hazardous working conditions. *Erwin*, 408 Ill. App. 3d at 262. This court held that the testimony of corporate officers in Illinois was relevant to injuries that took place in Texas and Arizona because the corporate officers created policies that affected working conditions. *Erwin*, 408 Ill. App. 3d at 279-81. In the case at bar, Thornton correctly distinguishes that, in *Erwin*, a small number of corporate officers may have actually known about the hazardous working conditions, whereas in the instant action Koss has not alleged that Thornton's corporate personnel knew about their auditor's alleged actions. *Erwin*, 408 Ill. App. 3d at 279-81.

¶ 98    However, although this is a distinguishing factor, we do not find it to be a dispositive one. In fact, the court in *Erwin* observed that three witnesses allegedly had knowledge of the risks involved, but also gave considerable weight to the need for 16 other corporate witnesses who were responsible only for corporate policymaking. *Erwin*, 408 Ill. App. 3d at 271.

¶ 99    Though *Erwin* may not be "on all fours" with the case at bar, it does illustrate the relevance of Thornton's corporate officers as witnesses. As discussed further below, Thornton's audit manual and bulletins govern Thornton's auditors' actions and are created and reviewed in Thornton's Cook County headquarters. In addition, most of Thornton's training programs are created and administered in Illinois. Despite these facts, the trial court here overlooked Koss's allegations of corporate inadequacy.

¶ 100    The burden remains with the movant to prove that the relevant factors "strongly favor[]" dismissal for a more convenient forum. (Emphasis omitted.) *Langenhorst*, 219 Ill. 2d at 442. However, even with defendant's substantial evidentiary burden, our supreme court has stated that "requiring extensive investigation prior to deciding a *forum non conveniens* motion would defeat the purpose of the *forum non conveniens* motion." *Gridley*, 217 Ill. 2d at 167. In *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 258 (1981), the United States Supreme Court held that it is not necessary for "defendants seeking *forum non conveniens* dismissal [to] submit affidavits identifying the witnesses they would call and the testimony these witnesses would provide if the trial were held in the alternative forum." It is unreasonable to require a plaintiff to prove up its entire case on a motion to dismiss for *forum non conveniens* where a defendant, with its greater evidentiary burden, has no such obligation.

¶ 101    The trial court rejected Koss's argument that defendant's corporate employees were relevant, stating "[p]laintiff have not cited the significance of any testimony potentially elicited from these individuals to further their claims of injury that took place in Milwaukee." However, Koss's complaint included a litany of allegations against Thornton's corporate policies and

18

training. In addition, Koss's answer to Thornton's motion to dismiss both named and described the relevance of Thornton's corporate personnel who may be called to testify at trial. It was unreasonable to require a plaintiff to compile further information through affidavits from each of its prospective witnesses on a motion to dismiss for *forum non conveniens*. Therefore, we will decide this appeal on the record below us.

¶ 102   Thornton argues that Koss's allegations of corporate negligence, fraud, and negligent misrepresentation are conclusory and thus should be dismissed. However, Thornton's argument is better suited for a motion to dismiss under section 2-615 of the Code of Civil Procedure with respect to pleadings for failure to state a claim. 735 ILCS 5/2-615 (West 2010). In this motion to dismiss for *forum non conveniens*, preliminary discovery was limited to *forum non conveniens* factors and it would be unreasonable for this court to even consider Thornton's argument that Koss has not pleaded a cause of action. Furthermore, the trial court's order granting Thornton's motion to dismiss for *forum non conveniens* did not discuss whether Koss's claims are conclusory. Therefore, Koss's allegations against Thornton are not conclusory and should have been given consideration by the trial court.

¶ 103   In order to review the propriety of the trial court's ruling, we will assess the motion to dismiss for *forum non conveniens* considering the indirect injury allegedly caused by Thornton's corporate personnel.

¶ 104                          B. Thornton's Evidentiary Burden

¶ 105   Koss claims that the trial court abused its discretion because Thornton did not satisfy the evidentiary burden on a *forum non conveniens* motion in two ways: (1) they did not provide

19

affidavits from witnesses stating that they would be unwilling to testify at a trial in Cook County; and (2) Thornton failed to proffer evidence that any witnesses in Wisconsin are relevant to the trial. We disagree and find that the circuit court did not abuse its discretion as it relates to the allocation of evidentiary burdens.

¶ 106    Koss first argues that Thornton did not carry its evidentiary burden to prove that witnesses would be unwilling to testify at trial. As stated previously, the burden is on the party asking for dismissal to show that the relevant factors " 'strongly favor' " transfer. (Emphasis omitted.) *Langenhorst*, 219 Ill. 2d at 442 (quoting *Griffith*, 136 Ill. 2d at 107). In the case at bar, Thornton did not proffer any evidence that witnesses are unwilling to testify in Cook County or that Illinois would be an inconvenient forum, and Koss claims that the trial court thus abused its discretion when it held that Wisconsin is a more convenient forum for witnesses. However, we know of no rule that bars a trial court from inferring the relative convenience of alternative forums, based on its knowledge of their residence and workplace.

¶ 107    Koss relies on three cases to support its proposition that, on a *forum non conveniens* motion, the movant must produce affidavits from witnesses stating they will not travel to a location. *Cradle Society v. Adopt America Network*, 389 Ill. App. 3d 73, 76 (2009); *Erwin*, 408 Ill. App. 3d at 277; *Brant v. Rosen*, 373 Ill. App. 3d 720, 728 (2007). However, in all three cases, the dispositive factor was that the defendants did not produce names or addresses of potential witnesses, yet they claimed that the plaintiff's choice of forum was inconvenient. *Cradle Society*, 389 Ill. App. 3d at 76 ("[A]s the burden of proof lies with the defendant on this issue, we will not speculate about a witness's whereabouts or unwillingness where [defendant] *has not yet*

*identified specific witnesses* who would be unwilling to testify in Illinois." (Emphasis added.));

*Erwin*, 408 Ill. App. 3d at 277 (dismissing defendant's *forum non conveniens* motion where

defendant failed to identify a single out-of-state witness); *Brant*, 373 Ill. App. 3d at 728 (holding

that the trial court could not speculate about the prospective inconvenience of unnamed

witnesses). These cases stand for the proposition that a court cannot speculate as to witnesses'

unwillingness to testify at trial *where the witnesses have not yet been identified.* In the case at

bar, the parties have named approximately 60 witnesses that reside closer to Milwaukee than

Cook County. Therefore, the trial court was within its discretion to consider the inconvenience to

witnesses residing in Wisconsin without affidavits from each witness stating his or her

unwillingness to travel.

¶ 108   Second, Koss argues that Thornton did not carry its evidentiary burden to prove the

relevance of out-of-state witnesses. Koss relies on one decades-old appellate case, *Schoon v. Hill*,

207 Ill. App. 3d 601, 608 (1990), that required a defendant to name which of its witnesses would

testify at trial and describe their testimony. In *Schoon*, the appellate court affirmed the trial

court's denial of a motion to dismiss for *forum non conveniens* where defendant failed to indicate

"which witnesses would actually be called to support its defense" and "what the testimony of

potential witnesses would be, how their testimony would impact the defense or whether or not

their depositions could be used successfully at trial." *Schoon*, 207 Ill App. 3d at 608. However, in

*Hernandez v. Karlin Foods Corp.*, 322 Ill. App. 3d 805, 810 (2001), our court affirmed a trial

court's inference that witnesses "who had knowledge about the case" could "reasonably be

expected to testify at trial." Similarly, in the case at bar, it can be reasonably expected that

Thornton's employees on the Koss engagement team are likely to testify given their direct involvement in the alleged injury. In addition, our supreme court has stated that "requiring extensive investigation prior to deciding a *forum non conveniens* motion would defeat the purpose of the *forum non conveniens* motion." *Gridley*, 217 Ill. 2d at 167. Our supreme court has held that it is not necessary for "defendants seeking *forum non conveniens* dismissal [to] submit affidavits identifying the witnesses they would call and the testimony these witnesses would provide if the trial were held in the alternative forum." *Piper Aircraft*, 454 U.S. at 258-59. Koss also contends that 2 of Thornton's 14 witnesses who reside in Wisconsin will likely invoke the fifth amendment and thus their testimony will not be relevant. U.S. Const., amend. V. We do not find this argument persuasive and decline to hypothesize whether prospective witnesses will or will not invoke their fifth amendment right. Therefore, the trial court did not abuse its discretion where it considered the likelihood that several Wisconsin residents would testify about the Koss audits.

¶ 109                              C. Koss's Motion to Strike Testimony

¶ 110   Koss claims that the trial court abused its discretion when it denied a motion to strike portions of an affidavit that was allegedly not "factually sufficient." Our colleague, Justice Joseph Gordon,[5] aptly explained the sufficiency required in affidavits in *forum non conveniens* cases in *Botello v. Illinois Central R.R. Co.*, 348 Ill. App. 3d 445, 450-52 (2004).

"Supreme Court Rule 187, which *** specifically pertains

to affidavits filed in support of *forum non conveniens* motions,

---

[5] Justice Joseph Gordon passed away on June 26, 2012.

22

provides in pertinent part:

> 'Hearings on motions to dismiss or transfer the action under the
> doctrine of *forum non conveniens* shall be scheduled so as to allow
> the parties sufficient time to conduct discovery on issues of fact
> raised by such motions. Such motions may be supported and
> opposed by affidavit. In determining issues of fact raised by
> affidavits, any competent evidence adduced by the parties shall
> also be considered. The determination of any issue of fact in
> connection with such a motion does not constitute a determination
> of the merits of the case or any aspect thereof.' 134 Ill. 2d R. 187.

As is the case with other non-Rule 191(a) affidavits, affidavits filed under Rule
187 are determined by a different standard than the sufficiency of those affidavits
required under Rule 191(a) for motions for summary judgement (section 2-1005),
involuntary dismissal (section 2-619), or jurisdiction over a person (section 2-
301(b)). See *Walker v. Iowa Marine Repair Corp.*, 132 Ill. App. 3d 621, 630, 477
N.E.2d 1335, 1341 (1985); see also *Haring v. Chicago & North Western
Transportation Co.*, 103 Ill. 2d 530, 533, 470 N.E.2d 288, 289 (1984). Both
federal and state courts agree that the sufficiency of affidavits filed in support of a
*forum non conveniens* motion is measured by the extent to which it allows the
trial court to balance the private and public interest factors, which will be
discussed in detail below. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257, 70 L.

Ed. 2d 419, 436, 102 S. Ct. 252, 266 (1981); *Moore v. AT&T Latin America Corp.*, 177 F. Supp. 2d 785, 790-91 (N.D. Ill. 2001); *Gasda v. Indian Harbor Belt R.R. Co.*, No. 98 C 8371 (N.D. Ill. August 2, 1999); *Countryman & Lee v. Stein Roe & Farnham*, 681 F. Supp. 479, 483-84 (N.D. Ill. 1987); *Walker*, 132 Ill. App. 3d at 630, 477 N.E.2d at 1341; *Haring*, 103 Ill. 2d at 533, 470 N.E.2d at 289.

These cases do not require that the information contained in the affidavit necessarily be based upon first-hand knowledge, as long as the affidavits are factually sufficient. See *Walker*, 132 Ill. App. 3d at 630, 477 N.E.2d at 1341; see also *Haring*, 103 Ill. 2d at 533, 470 N.E.2d at 289. The courts agree that, based upon the difference in the stage of litigation which invokes the issue of summary judgment and that which invokes *forum non conveniens*, an affidavit filed in support of a *forum non conveniens* motion requires less specificity and less detail. See *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 258, 70 L. Ed. 2d 419, 437, 102 S. Ct. 252, 266 (1981) (finding that at the *forum non conveniens* stage of the litigation some leeway in specificity of an affidavit must be given); *Walker*, 132 Ill. App. 3d at 630, 477 N.E.2d at 1341 (holding that so long as the affidavit can show that information and witnesses necessary to the trial are located in counties far more convenient to the action, no more specificity is required). This distinction which the courts have drawn between *forum non conveniens* and summary judgment motions as to specificity and level of detail is consistent with the fact that the affidavits filed under Rule 187 are omitted from the prerequisites set forth

in Rule 191(a). 210 Ill. 2d R. 191(a). Accordingly, we are not convinced that affidavits should be considered insufficient even if they contain elements of hearsay. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257, 102 S. Ct. 252, 266, 70 L. Ed. 2d 419, 436 (1981); *Walker*, 132 Ill. App. 3d at 630, 477 N.E.2d at 1341; *Haring*, 103 Ill. 2d at 533, 470 N.E.2d at 289; accord *Butcher v. Gerber Products Co.*, No. 98 CIV 1819 (RWS) (S.D.N.Y. August 3, 1998) (finding that one affidavit including a general statement of the nature of witness testimony is sufficient and the plaintiff need not procure an affidavit from each individual witness outlining his or her specific testimony)." *Botello*, 348 Ill. App. 3d at 450-52.

¶ 111   In *Botello*, the risk manager for the defendants railroad and railroad company filed an affidavit in support of the defendants' motion to dismiss based on *forum non conveniens*. *Botello*, 348 Ill. App. 3d at 447. The affidavit set forth the names and addresses of railroad employees, police officers at the scene of the accident, responding medical personnel, and the location of employment records. *Botello*, 348 Ill. App. 3d at 453. The court held that "the contents of the *** affidavit sufficiently demonstrated that there were witnesses and information necessary to the trial of the case that could be more conveniently produced if the case was tried in the suggested alternate forum ***." *Botello*, 348 Ill. App. 3d at 453.

¶ 112   *Walker* concerned an injury of a ship engineer while working in the ship engine room. *Walker*, 132 Ill. App. 3d at 622. The defendant filed an affidavit in support of its motion to dismiss for *forum non conveniens*, which set forth the names and counties of residence of co-

workers and the port engineer, as well as the location of employment records and company representatives. *Walker*, 132 Ill. App. 3d at 630. The court held that "The contents of the motion and affidavit are sufficient to show therefore that information and witnesses necessary to the trial are located in counties far more convenient to this action than Cook." *Walker*, 132 Ill. App. 3d at 630.

¶ 113   *Haring* concerned the injury of a railroad employee. *Haring*, 103 Ill. 2d at 531. The defendant railroad's affidavit in support of its motion to dismiss on the basis of *forum non conveniens* set forth the names and addresses of railroad coworkers, supervisors, and other witnesses of the accident. *Haring*, 103 Ill. 2d at 532-33. The court held that "[t]he contents of [defendant's] affidavit are sufficient to demonstrate that there are witnesses necessary to the trial of this case whose testimony can be more conveniently produced [in the alternate forums]." *Haring*, 103 Ill. 2d at 533. However, the plaintiff's affidavit copied a list of more than 250 names of the defendant's management employees and asserted that some may be witnesses. *Haring*, 103 Ill. 2d at 533. The court stated this affidavit was deficient. *Haring*, 103 Ill. 2d at 533.

¶ 114   Like the factually sufficient affidavits in *Botello*, *Walker*, and *Haring*, Hafer's affidavit sets forth specific information on the locations of specific Thornton and Koss personnel and specific documents. Unlike the deficient plaintiff's affidavit in Haring, Hafer's affidavit does not present merely "general allegations." Haring, 532. Though Exhibit 1 attached to Hafer's affidavit did not include the names of the 18 engagement team members, their names were easily ascertainable in other evidence in support of the motion to dismiss.

¶ 115   Though Hafer did not conduct original research on the information presented in her

affidavit, she reviewed and presented evidence, including the locations and roles, of specific potential Thornton and Koss witnesses. Furthermore, Hafer's deposition testimony does not necessarily contradict or undermine the statements in her affidavit. The statements that she "reviewed" or "obtained" the information in question encompass reviewing information given her by an attorney.

¶ 116   Therefore, we hold that the trial court did not abuse its discretion in denying Koss's motion to strike portions of Hafer's affidavit.

¶ 117                    V. Koss's Choice of Forum

¶ 118   Before weighing the relevant factors, a court must first decide how much deference to give to a plaintiff's choice of forum. *Langenhorst*, 219 Ill. 2d at 448 (the supreme court determined the appropriate amount of deference, before weighing the relevant factors).

¶ 119   In the case at bar, the trial court did not accord reasonable deference to Koss's choice of forum. The plaintiff's choice of forum is a "substantial factor" in deciding a *forum non conveniens* motion. *Dawdy*, 207 Ill. 2d at 172; *Griffith*, 136 Ill. 2d at 106. "Thus, when a plaintiff chooses his home forum or the site of the accident or injury, it is reasonable to assume that the choice of forum is convenient." *Gridley*, 217 Ill. 2d at 170; *Dawdy*, 207 Ill. 2d at 173.

¶ 120   The trial court held, and Thornton argues, that Koss's choice of forum deserves less deference because it is neither Koss's home forum nor the site of its injury. Although Cook County is not Koss's home forum, the alleged inadequate policies, procedures, and training discussed above were mostly created, reviewed, and approved in Cook County. Thus, Cook County is the site of a substantial portion of the acts that gave rise to Koss's injury. Koss's choice

of forum should be accorded standard deference and, therefore, the trial court's application of "less deference" was improper.

¶ 121                 VI. Private Interest Factors

¶ 122   The Illinois Supreme Court has held that a court must consider both "the private and public interest factors" in deciding a *forum non conveniens* motion. *Langenhorst*, 219 Ill. 2d at 443; *Gridley*, 217 Ill. 2d at 170; *Dawdy*, 207 Ill. 2d at 172-73. The private interest factors include: " '(1) the convenience of the parties; (2) the relative ease of access to sources of testimonial, documentary, and real evidence; and (3) all other practical problems that make trial of a case easy, expeditious, and inexpensive ***.' " *Langenhorst*, 219 Ill. 2d at 443 (quoting *First American Bank v. Guerine*, 198 Ill. 2d 511, 517 (2002)); *Gridley*, 217 Ill. 2d at 170; *Dawdy*, 207 Ill. 2d at 172.

¶ 123   First, the convenience of the parties does not weigh in favor of transfer to Wisconsin. With respect to this factor, "the defendant must show that the plaintiff's chosen forum is inconvenient to the defendant." *Langenhorst*, 219 Ill. 2d at 450. "[T]he defendant cannot assert that the plaintiff's chosen forum is inconvenient to the plaintiff." *Langenhorst*, 219 Ill. 2d at 445.

¶ 124   One consideration is Thornton's corporate headquarters. *Vivas*, 392 Ill. App. 3d at 658 (location of defendant's headquarters in Illinois weighed against the situs of the plane crash in Peru); *Erwin*, 408 Ill. App. 3d at 276 (location of defendant's headquarters and alleged source of safety policies weighed against plaintiffs' residences in Arizona and Texas). Thornton's headquarters is in Chicago, Illinois. While *Gridley* states that the defendant's principal place of business is "not dispositive" and "only one factor to be considered" (*Gridley*, 217 Ill. 2d at 173),

this case is distinguishable. *Gridley* concerned the defendant insurance company's compliance with state automobile salvage laws. *Gridley*, 217 Ill. 2d at 174. The defendant's headquarters was the only connection to Illinois, and the headquarters was unconnected to the litigation, since the defendant "handle[d] compliance with salvage laws on a state-by-state basis ***." *Gridley*, 217 Ill. 2d at 174. The Illinois Supreme Court dismissed on the basis of *forum non conveniens*. *Gridley*, 217 Ill. 2d at 161. Unlike *Gridley*, Thornton's corporate headquarters is connected to the litigation as the source of firm-wide policies and auditor training.

¶ 125    Furthermore, although most witnesses concerning the Koss audit engagements reside in Wisconsin, several witnesses concerning Thornton's policies and auditor training reside in Illinois. Koss has averred that its directors are not inconvenienced by litigating in Cook County. It is unclear whether Thornton's Wisconsin witnesses would be inconvenienced by coming to Cook County. The distance alone is not unreasonable or inconvenient.

¶ 126    Cook County is less than 100 miles from the courthouse in Milwaukee County. While there is no bright-line rule of inconvenient distances, Thornton cites Illinois Supreme Court cases holding that distances of 100 miles and less were still inconvenient. *Peile v. Skelgas, Inc.*, 163 Ill. 2d 323, 341 (1994) (100 miles from the site of the accident was inconvenient); *Washington v. Illinois Power Co.*, 144 Ill. 2d 395, 402 (1991) (30 miles between counties was inconvenient). However, in *Piele*, "virtually none of the witnesses or other sources of proof [were] located in [the plaintiff's chosen county]." *Peile*, 163 Ill. 2d at 340. Unlike *Peile*, several witnesses for Thornton's firm-wide policies and training are located in Illinois, closer to Chicago than Milwaukee. In *Washington*, only the corporate defendant was a resident of plaintiff's chosen

county, but it was also a resident of the other county in question. *Washington*, 144 Ill. 2d at 400. Again, the present case is also distinguishable from *Washington* because several witnesses reside in Illinois, closer to Chicago than Milwaukee.

¶ 127   Second, the relative ease of access to sources of testimonial, documentary and real evidence does not require transfer to Wisconsin. Koss averred that it would try to ensure that the company's employees and members of its board would be available to testify in Cook County. Employees of Koss and Thornton can be compelled to testify in either state. Ill. S. Ct. R. 237(b) (eff. July 1, 2005). See *Cradle Society*, 389 Ill. App. 3d at 77 ("Ohio representatives employed by [defendant] are subject to compulsory process in Illinois"). Thornton employees identified as potential witnesses reside in both Illinois and Wisconsin. This case is thus distinguishable from *Satkowiak v. Chesapeake & Ohio Ry. Co.*, 106 Ill. 2d 224 (1985). In *Satkowiak*, all but one of the witnesses resided in one state, and that single witness was not an employee of any of the parties. *Satkowiak*, 106 Ill. 2d at 229. The possibility of employees leaving the company and eluding compulsory process favored dismissal in that case. *Satkowiak*, 106 Ill. 2d at 230-31. In the case at bar, where employees reside in both states, this concern does not favor one forum or the other.

¶ 128   The documentary evidence exists mainly electronically and, as such, is available in either forum. With respect to hard-copy documents, the location of documents and records has become a less significant factor in *forum non conveniens* analysis in the modern age of e-mail, Internet, telefax, copying machines and worldwide delivery services, since they can now be easily copied and sent. *Woodward*, 368 Ill. App. 3d at 834.

¶ 129    Lastly, the court must consider all the other " 'practical problems that make trial of a case easy, expeditious, and inexpensive.' " *Langenhorst*, 219 Ill. 2d at 443 (quoting *Guerine*, 198 Ill. 2d at 517). Both Koss's and Thornton's attorneys maintain offices in Cook County. The Illinois Supreme Court has stated that, while little weight should be accorded this factor, a court may still consider it in the *forum non conveniens* analysis. *Dawdy*, 207 Ill. 2d at 179; *Woodward*, 368 Ill. App. 3d at 836.

¶ 130    In sum, the private interest factors do not favor either party.

¶ 131                              VII. Public Interest Factors

¶ 132    When deciding a *forum non conveniens* motion, a court must also consider the public interest factors. These factors include: "(1) the interest in deciding controversies locally; (2) the unfairness of imposing trial expense and the burden of jury duty on residents of a forum that has little connection to the litigation; and (3) the administrative difficulties presented by adding litigation to already congested court dockets." *Langenhorst*, 219 Ill. 2d at 443-44 (citing *Guerine*, 198 Ill. 2d at 516-17); *Gridley*, 217 Ill. 2d at 170; *Dawdy*, 207 Ill. 2d at 173.

¶ 133    First, Koss argues that Cook County has a significant interest in deciding the case at bar locally. Our supreme court has held that a forum has a significant interest in deciding a controversy locally where a cause of action that occurs within its borders gives rise to an injury. *Dawdy*, 207 Ill. 2d at 183; see also *Smith v. Jewel Food Stores, Inc.*, 374 Ill. App. 3d 31, 34 (2007) (holding that Kendall County had a significant interest in a dispute where an automobile accident occurred within its borders). Furthermore, a forum has "an interest in ensuring the safety of the products that its corporations build and ship throughout the world, particularly when one

31

of those corporations has its world headquarters here." *Vivas*, 392 Ill. App. 3d at 661. While the location of a corporate headquarters is not a "dispositive" factor, it is still a factor we may consider. *Gridley*, 217 Ill. 2d at 173.

¶ 134    In the case at bar, Koss alleges that Thornton's corporate personnel, who are headquartered in Cook County, are responsible for inadequate policies, procedures, and training. If these factual allegations are proven at trial, a substantive portion of the acts that gave rise to Koss's injury will have occurred within Cook County. Therefore, like in *Jewel Food*, where a county had significant interest in an accident that occurred within its borders, Cook County has a significant interest in deciding the case at bar. *Jewel Food*, 374 Ill. App. 3d at 34. In addition, like in *Vivas*, where the United States had an interest in ensuring the quality of products manufactured by a corporation headquartered in the United States, in the case at bar, Cook County has an interest in ensuring the quality of services offered by a corporation headquartered in Cook County. *Vivas*, 392 Ill. App. 3d at 661. Thornton argues that Milwaukee County also has a similar interest in deciding this case because the audits at issue took place within its borders and because the auditors are licensed by the State of Wisconsin. Although Thornton's argument illustrates that Milwaukee County has an interest in this controversy, it does not satisfy Thornton's burden to show that the factor strongly favors dismissal to an alternative forum since both jurisdictions are affected.

¶ 135    Second, Koss argues that, because Cook County has a significant connection to the case at bar, it is fair to impose trial expenses and the burden of jury duty on residents of Cook County. We agree. Our supreme court has instructed that the residents of one county "should not be

burdened with jury duty" where the events at issue occurred in another county. *Dawdy*, 207 Ill. 2d at 183. However, as discussed above, a significant portion of the alleged events took place at Thornton's headquarters in Cook County. Therefore, it is fair and reasonable to impose both trial expenses and the burden of jury duty on residents of Cook County.

¶ 136  Third, Koss argues that Cook County resolves civil suits faster than Milwaukee County and, thus, an analysis of court congestion favors Cook County. We agree, although our supreme court has held that "[w]hen deciding *forum non conveniens* issues, the trial court is in the better position to assess the burdens on its own docket." *Langenhorst*, 219 Ill. 2d at 451. In the case at bar it is unrefuted that the circuit court of Cook County disposes of its cases faster than Milwaukee County courts. The trial court here disregards this unrefuted fact. However, there is no evidence presented by either party comparing the courts' docket of cases and its average length of time to trial.

¶ 137  Finally, Koss argues that choice of law is not an important consideration on a motion to dismiss for *forum non conveniens*. We agree. Although choice-of-law issues are a factor to consider, they are not usually dispositive. *Woodward*, 368 Ill. App. 3d at 837. "An Illinois court is competent to determine which law applies to this controversy and to apply the law of [Wisconsin] if necessary." *Woodward*, 368 Ill. App. 3d at 837. In the case at bar, the trial court did not address choice of law in its order granting Thornton's motion to dismiss.

¶ 138  In sum, we find that public interest factors favor Illinois as a proper forum.

¶ 139                                    VIII. Balancing

¶ 140   In deciding a *forum non conveniens* motion, the trial court "must balance the private and public interest[]" factors. *Dawdy*, 207 Ill. 2d at 172; *Gridley*, 217 Ill. 2d at 169-70. The balancing should be done "without emphasizing any one factor." *Langenhorst*, 219 Ill. 2d at 443; *Gridley* 217 Ill. 2d at 169; *Dawdy*, 207 Ill. 2d at 180. "On review, the trial court's decision will be reversed only if *** the court abused its discretion in balancing the relevant factors." *Dawdy*, 207 Ill. 2d at 172; *Griffith*, 136 Ill. 2d at 106. The Illinois Supreme Court has stated: "A circuit court abuses its discretion in balancing the relevant factors only where no reasonable person would take the view adopted by the circuit court." *Langenhorst*, 219 Ill. 2d at 442; *Gridley*, 217 Ill. 2d at 169; *Dawdy*, 207 Ill. 2d at 177.

¶ 141   In *Chung v. Advocate Health Care*, 336 Ill. App. 3d 789, 790-91 (2002), our court reversed a dismissal based on *forum non conveniens* in a medical malpractice case brought in Cook County. Factors favoring the alternate forum included: the alleged malpractice occurred in the alternate forum, and 11 occurrence witnesses, the plaintiffs, and most of the defendants resided in the alternate forum. *Chung*, 336 Ill. App. 3d at 794-95. Factors favoring Cook County included: the hospital where the malpractice occurred maintained a residence in Cook County; the hospital the plaintiff later transferred to was in Cook County; two occurrence witnesses and "a number of physicians" from the transfer hospital resided in Cook County; and other witnesses were spread across various other counties and states. *Chung*, 336 Ill. App. 3d at 795. This court held that, while both counties had ties to the case, the private and public interest factors did not

strongly favor the alternate forum and we reversed the trial court's dismissal on grounds of *forum non conveniens*. *Chung*, 336 Ill. App. 3d at 795-96.

¶ 142   The case at bar is similar to *Chung* in that there are ties to both Cook County and the alternate forum; however, the factors do not strongly favor the alternate forum. First, Koss's choice of forum deserved standard deference because actions causing the alleged injury took place in part at Thornton's headquarters in Cook County. Second, the private interest factors do not favor transfer because witnesses are spread between Wisconsin and Illinois and documentary evidence existed electronically. Third, the public interest factors do not favor Thornton because Illinois has a significant interest in the controversy and, thus, it is fair to impose trial expenses and jury duty on Illinois residents. As the private and public interest factors did not weigh strongly in favor of transfer and since the trial court did not consider a significant amount of Koss's allegations in its complaint, we find the trial court abused its discretion in transferring this case.

¶ 143                            IX. Conclusion

¶ 144   For the foregoing reasons, we reverse and remand the trial court's order granting Thornton's motion to dismiss on *forum non conveniens* grounds.

¶ 145   Reversed and remanded.

# Koss Fee Agreement

## Michael J. Avenatti [mavenatti@eaganavenatti.com]

**Sent:** Wednesday, June 13, 2012 6:58 PM
**To:** Joseph A. Power Jr.
**Importance:** High

Joe:

Alex shared with me your discussion earlier today. This email confirms that the additional 5% fee kicker to your firm is effective by way of you arguing the appeal later this month.

Best,

Michael

Michael J. Avenatti, Esq.
Eagan Avenatti, LLP
450 Newport Center Drive, Second Floor
Newport Beach, CA 92660
Tel: (949) 706-7000
Fax: (949) 706-7050
Cell: (949) 887-4118
mavenatti@eaganavenatti.com

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system. Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.



EXHIBIT
E

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

KOSS CORPORATION, a Delaware corporation,  )
)
        Plaintiff,          )   Case No. 13 L 4011
)
     v.             )
)
SUJATA SACHDEVA, a natural person, and  )
GRANT THORNTON, LLP, an Illinois Limited  )
Liability Partnership,           )
)
        Defendants.      )

### AGREED ORDER TO DISMISS WITH PREJUDICE

This cause coming to be heard by agreement of the parties and the Court being fully advised in the premises, IT IS HEREBY ORDERED that:

1.     Plaintiff Koss Corporation's claims are dismissed with prejudice.

2.     Defendant Grant Thornton LLP's Counterclaim and Third-Party Complaint are dismissed with prejudice.

3.     Each party shall bear its own costs.

4.     The hearing date previously set for July 1, 2013, and any other pending dates, are hereby stricken.



ENTERED
JUDGE FRANK CASTIGLIONE 1675
JUL - 1 2013
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

Linton J. Childs
SIDLEY AUSTIN LLP (#42418)
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000



EXHIBIT
F



EAGAN AVENATTI, LLP
OPERATING ACCOUNT

CALIFORNIA BANK & TRUST
LA BRANCH OFFICE
16.330/1220

09204

10/14/2013

PAY TO THE
ORDER OF Power Rogers & Smith, P.C. $

Three Hundred Forty-Six Thousand, Thirty-Five and 79/100 ************************** DOLLARS

Power Rogers & Smith, P.C.
Joseph A. Power
70 W. Madison Street, 55th Floor
Chicago, IL 60602

MEMO

⑈009204⑈ ⑆122003396⑈ 326013846 1⑈

---

**EAGAN AVENATTI, LLP**

Power Rogers & Smith, P.C.                    10/14/2013

7,285.79

CBT - Operating 8461                                    346,035.79



EXHIBIT
G

## Judy K. Regnier

**From:** Gina A. Melo
**Sent:** Monday, June 30, 2014 9:49 AM
**To:** Maritza Nowowiejski; Judy K. Regnier
**Subject:** Msg: Gail Striker

Re: Eden
Wants to know how she can find out if her parents graves were disturbed.
(760) 464-4222

Thanks.

Gina A. Melo
EAGAN AVENATTI, LLP
450 Newport Center Drive, Second Floor
Newport Beach, CA 92660
(949) 706-7000
(949) 706-7050 (Fax)
gmelo@eaganavenatti.com

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system. Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

Exhibit B

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

POWER, ROGERS & SMITH, An Illinois  )
Professional Corporation  )
      )
    Plaintiff,  )    No. 14L 004136
      )
      )
EAGAN AVENATTI, LLP, a California Limited  )
Liability Partnership f/k/a EAGAN O'MALLEY  )
& AVENATTI, LLP; and MICHAEL J.  )
AVENATTI, individually  )
      )
    Defendants.  )

## DEFENDANT MICHAEL J. AVENATTI'S NOTICE OF FILING NOTICE OF REMOVAL OF ACTION

**To:**   POWER ROGERS & SMITH, P.C.
      70 W. Madison Street, 55th Fl.
      Chicago, IL 60602

NOTICE IS HEREBY GIVEN that on the 30th day of June, 2014, Defendant Michael J. Avenatti filed in the United States District Court for the Northern District of Illinois a Notice of Removal of this action to the United States District Court from the Circuit Court of Cook County, Illinois, pursuant to 28 U.S.C. § 1446(d). A true copy of that Notice of Removal (without exhibits) is attached as Exhibit "A." Accordingly, pursuant to 28 U.S.C. § 1446(d), the Circuit Court of Cook County shall proceed no further with this action unless and until the case is remanded.

Dated this 30th day of June, 2014.

              EAGAN AVENATTI, LLP

              By: _Michael J Avenatti_
                Michael J. Avenatti
                Defendant in Pro Per

EXHIBIT B

Michael J. Avenatti *(In Pro Per)*
EAGAN AVENATTI, LLP
450 Newport Center Drive, Second Floor
Newport Beach, CA 92660
Phone: (949) 706-7000
Fax: (949) 706-7050

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| POWER, ROGERS & SMITH, An Illinois Professional Corporation | ) ) ) | |
| Plaintiff, | ) ) | No. |
| | ) ) | |
| EAGAN AVENATTI, LLP, a California Limited Liability Partnership f/k/a EAGAN O'MALLEY & AVENATTI, LLP; and MICHAEL J. AVENATTI, individually | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## CERTIFICATE OF SERVICE

I, Katherine L. Mosby, hereby certify that on June 30, 2014, DEFENDANT MICHAEL J. AVENATTI'S NOTICE OF REMOVAL OF ACTION was served by email and facsimile on:

Sean M. Houlihan
POWER ROGERS & SMITH, P.C.
70 W. Madison
Chicago, Illinois 60602

Katherine L. Mosby *(kmosby@eaganavenatti.com)*